# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

JASON M. COX, ESTEVAN CASTILLO,
LEO THOMAS TOOKES, JR., and ALESIA LEWIS-VINSON,

Plaintiffs/Appellees,

v.

COMMUNITY LOANS OF AMERICA, INC., et al.,

Defendants/Appellants.

Rule 23(f) Appeal from a Class-Certification Order
of the United States District Court for the Middle District of Georgia

## BRIEF OF APPELLANTS COMMUNITY LOANS OF AMERICA, *et al.*

Stephen M. Forte
Edward H. Wasmuth, Jr.
David C. Newman
Colin R.P. Delaney

SMITH, GAMBRELL & RUSSELL, LLP
Promenade, Suite 3100
1230 Peachtree Street, N.E.
Atlanta, Georgia 30309-3592
Telephone: 404-815-3500
Facsimile: 404-815-3509

*Attorneys for Defendants/Appellants*

*Defendants/Appellants:*

Community Loans of America, Inc.
Alabama Title Loans, Inc.
Georgia Auto Pawn, Inc.
PR Auto Loans, LLC
Mississippi Title Loans, Inc.
Tennessee Title Loans, Inc.
Texas Title and Payday Loans, LLC
Texas Car Title and Payday Loan Services, Inc.
Fast Auto Loans, Inc.
Delaware Title Loans, Inc.
Idaho Title Loans, Inc.
Illinois Title Loans, Inc.
Fast Auto and Payday Loans, Inc. d/b/a Cash Cow
Southern Fast Loans of Louisiana, Inc. d/b/a Cash Cow
Missouri Title Loans, Inc.
New England Auto Finance, Inc.
New England Auto and Pay Loans, Inc.
New Mexico Title Loans, Inc.
Nevada Title and Payday Loans, Inc.
Dakota Auto Title Loans, Inc.
Utah Title Loans, Inc.
Wisconsin Auto Title Loans, Inc.
Robert I. Reich
Terry Fields

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

IN ACCORDANCE with Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, counsel for Defendants/Appellants hereby certifies that to the best of counsel's knowledge, the following is a complete list of trial judge(s), all attorneys, persons, associations of persons, firms, partnerships, or corporations that may have an interest in the outcome of this case or appeal, including subsidiaries, conglomerates, affiliates and parent corporations, including any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party:

1. Ad-Vantage Advertising, Inc. (affiliate of Defendants)

2. Alabama Title Acquisition, Inc. (affiliate of Defendants)

3. Alabama Title Loans, Inc. (Defendant)

4. America's Gold Buyers, LLC  (created in Arizona) (affiliate of Defendants)

5. America's Gold Buyers, LLC (created in Delaware) (affiliate of Defendants)

6. America's Gold Buyers, LLC (created in Georgia) (affiliate of Defendants)

7. America's Gold Buyers, LLC (created in Louisiana) (affiliate of Defendants)

8. Atlanta Direct Auto Finance, Inc. (affiliate of Defendants)

9. Automotive Remarketing, Inc. (affiliate of Defendants)

10. Barnes Law Group, LLC (counsel for Named Plaintiffs)

11. Barnes, Roy E., Esq. (counsel for Named Plaintiffs)

12. Bevis, John R., Esq. (counsel for Named Plaintiffs)

13. Bowers, Christopher J., Esq. (counsel for Defendants)

14. California Auto Lenders, LLC (affiliate of Defendants)

15. Carolina Payday Loans, Inc. (affiliate of Defendants)

16. Carolina Title Loans, Inc. (affiliate of Defendants)

17. Castillo, Estevan (Named Plaintiff)

18. CF of Georgia, LLC (affiliate of Defendants)

19. CLA UK Holdings, LLC (affiliate of Defendants)

20. CLPS, LLC (affiliate of Defendants)

21. Community GSA, LLC (affiliate of Defendants)

22. Community Management, LLC (affiliate of Defendants)

23. Community UK Holdings, LLC (affiliate of Defendants)

24. Consumer Funding, LLC (affiliate of Defendants)

25. Cox, Jason M. (Named Plaintiff)

26. Crowley, Scott C. , Esq. (former counsel for Named Plaintiffs)

27. Crowley | McKoon (former counsel for Named Plaintiffs)

28. Dakota Auto Title Loans, Inc. (Defendant)

29. Dakota Title Loans, Inc. (affiliate of Defendants)

30. Day | Crowley, LLC (former counsel for Named Planitiffs)

31. Delaney, Colin R.P., Esq. (counsel for Defendants)

32. Delaware Title Loans, Inc. (Defendant)

33. Drake, Martin H., Esq. (former counsel for Named Plaintiffs)

34. Fast Auto & Payday Loans, Inc. (created in Iowa) (affiliate of Defendants)

35. Fast Auto & Payday Loans, Inc. (created in Louisiana) (Defendant)

36. Fast Auto and Payday Loans, Inc. (created in Michigan) (affiliate of Defendants)

37. Fast Auto and Payday Loans, Inc. (created in Ohio) (affiliate of Defendants)

38. Fast Auto and Payday Loans, Inc. (created in Washington) (affiliate of Defendants)

39. Fast Auto and Payday Loans, LLC (affiliate of Defendants)

40. Fast Auto Loans, Inc. (created in Arizona) (Defendant)

41. Fast Auto Loans, Inc. (created in Virginia) (affiliate of Defendants)

42. Fast Auto Loans of Texas, LLC (affiliate of Defendants)

43. Fast Forward Payments, Inc. (affiliate of Defendants)

44. Fast Payday Loans, Inc. (created in Arizona) (affiliate of Defendants)

45. Fast Payday Loans, Inc. f/k/a Fast Auto Loans, Inc. (created in Florida) (affiliate of Defendants)

46. Fast Payday Loans, Inc. (created in Michigan) (affiliate of Defendants)

47. Fast Payday Loans, Inc. (created in Virginia) (affiliate of Defendants)

48. Fast Payday Loans, Inc. (created in Washington) (affiliate of Defendants)

49. Fast Payday Loans of Colorado, LLC (created in Colorado) (affiliate of Defendants)

50. Fast Payday Loans of Colorado, LLC (created in Georgia) (affiliate of Defendants)

51. Fast Payday Loans of Indiana, LLC (created in Georgia) (affiliate of Defendants)

52. Fast Payday Loans of Indiana, LLC d/b/a Fast Payday Loans (created in Indiana) (affiliate of Defendants)

53. Fast Payday Loans of Iowa, LLC (created in Georgia) (affiliate of Defendants)

54. Fast Payday Loans of Iowa, LLC (created in Iowa) (affiliate of Defendants)

55. Fast Payday Loans of Kansas, LLC (created in Georgia) (affiliate of Defendants)

56. Fast Payday Loans of Kansas, LLC (created in Kansas) (affiliate of Defendants)

57. Fast Payday Loans of Kentucky, LLC (created in Georgia) (affiliate of Defendants)

58. Fast Payday Loans of Kentucky, LLC (created in Kentucky) (affiliate of Defendants)

59. Fast Payday Loans of Nebraska, LLC (affiliate of Defendants)

60. Fast Payday Loans of Ohio, LLC (created in Georgia) (affiliate of Defendants)

61. Fast Payday Loans of Ohio, LLC d/b/a/ Fast Payday Loans (created in Ohio) (affiliate of Defendants)

62. Fast Payday Loans of Nebraska, LLC (created in Georgia) (affiliate of Defendants)

63. Fast Payday Loans of Nebraska, LLC (created in Nebraska) (affiliate of Defendants)

64. Fast Texas Title Credit, LLC (affiliate of Defendants)

65. Fast Title Credit, LLC (affiliate of Defendants)

66. Fast Title Loans of Louisiana, LLC (created in Georgia) (affiliate of Defendants)

67. Fast Title Loans of Louisiana, LLC (created in Louisiana) (affiliate of Defendants)

68. Fields, Terry (Defendant)

69. Fischer | Scott, LLC (counsel for Named Plaintiffs)

70. Fischer, Kyle S., Esq. (counsel for Named Plaintiffs)

71. Forte, Stephen M., Esq. (counsel for Defendants)

72. Georgia Auto Pawn, Inc. (Defendant)

73. Georgia Title Acquisition, Inc. (affiliate of Defendants)

74. Idaho Title Loans, Inc. (Defendant)

75. Illinois Title Loans, Inc. (Defendant)

76. Indian Harbor Insurance Company (insurer)

77. Land, Hon. Clay D. (Judge, United States District Court)

78. Loan Star Title and Payday, LLC (affiliate of Defendants)

79. Lewis-Vinson, Alesia (Named Plaintiff)

80. Mississippi Title Loans, Inc. (Defendant)

81. Missouri Title Loans, Inc. (Defendant)

82. Montana Title Loans, Inc. (affiliate of Defendants)

83. Nation Wide Gold Buyers, LLC (affiliate of Defendants)

84. National Auto Lenders, Inc. (affiliate of Defendants)

85. Nevada Title & Payday Loans, Inc. (Defendant)

86. New England Auto Finance, Inc., f/k/a New England Auto and Payday
    Loans, Inc. (mis-identified in the Second Amended Complaint as New
    England Auto and Pay Loans, Inc.) (Defendant)

87. New Mexico Title Loans, Inc. (Defendant)

88. Newman, David C., Esq. (counsel for Defendants)

89. North Carolina Auto Loans, Inc. (affiliate of Defendants)

90. PR Auto Loans, LLC (created in Georgia) (Defendant)

91. PR Auto Loans, LLC (created in Puerto Rico) (affiliate of Defendants)

92. Premium Title Lenders, LLC (affiliate of Defendants)

93. Premium Title Lending, LLC (affiliate of Defendants)

94. Premium Title Loan Company, LLC f/k/a Premium Title Loans, LLC (affiliate of Defendants)

95. Premium TLC, LLC (affiliate of Defendants)

96. Reich, Robert I. (Defendant)

97. Reicher, Hulsman and Associates, Inc. (created in Alabama) (affiliate of Defendants)

98. Reicher, Hulsman and Associates, Inc. (created in Arizona) (affiliate of Defendants)

99. Reicher, Hulsman and Associates, Inc. (created in Georgia) (affiliate of Defendants)

100. Reicher, Hulsman and Associates, Inc. (created in Illinois) (affiliate of Defendants)

101. Reicher, Hulsman and Associates, Inc. (created in Missouri) (affiliate of Defendants)

102. Reicher, Hulsman and Associates, Inc. (created in Mississippi) (affiliate of Defendants)

103. Reicher, Hulsman and Associates, Inc. (created in South Carolina) (affiliate of Defendants)

104. Reicher, Hulsman and Associates, Inc. (created in Texas) (affiliate of Defendants)

105. Reicher, Hulsman and Associates, Inc. (created in Utah) (affiliate of Defendants)

106. Resale Autos, Inc. (affiliate of Defendants)

107. Sanders, Wm. Parker, Esq. (counsel for Defendants)

108. Smith, Gambrell & Russell, LLP (counsel for Defendants)

109. South Carolina Title Acquisition, Inc. (affiliate of Defendants)

110. Southern Fast Loans of Alabama, LLC (created in Alabama) (affiliate of Defendants)

111. Southern Fast Loans of Alabama, LLC (created in Georgia) (affiliate of Defendants)

112. Southern Fast Loans of Georgia, Inc. (created in Florida) (affiliate of Defendants)

113. Southern Fast Loans of Georgia, Inc. (created in Georgia) (affiliate of Defendants)

114. Southern Fast Loans of Louisiana, Inc. (Defendant)

115. Southern Fast Loans of Mississippi, Inc. (affiliate of Defendants)

116. Southern Fast Loans of South Carolina, Inc. (affiliate of Defendants)

117. Southern Fast Title Loans of South Carolina, Inc. (affiliate of Defendants)

118. Tennessee Cash Cow, Inc. (affiliate of Defendants)

119. Tennessee Title Acquisitions, Inc. (affiliate of Defendants)

120. Tennessee Title Loans, Inc. (Defendant)

121. Texas Car Title & Payday Credit, Inc. (affiliate of Defendants)

122. Texas Car Title & Payday Loans, Inc. (affiliate of Defendants)

123. Texas Car Title & Payday Loan Services, Inc. (Defendant)

124. Texas Loan Services, Inc. (created in Georgia) (affiliate of Defendants)

125. Texas Loan Services, Inc. (forced d/b/a is Community Business Services, Inc.) (created in Texas) (affiliate of Defendants)

126. Texas Title and Payday Loans, LLC (Defendant)

127. Texas Title Loans, LLC (affiliate of Defendants)

128. Tookes, Leo Thomas, Jr. (Named Plaintiff)

129. Triangle Financial Inc. (affiliate of Defendants)

130. Tribble, J. Cameron, Esq. (counsel for Named Plaintiffs)

131. USA Payday Lenders, LLC (affiliate of Defendants)

132. United States Title Loan Company (affiliate of Defendants)

133. US Title Loans, Inc. (affiliate of Defendants)

134. Utah Title Loans, Inc. (Defendant)

135. Virginia Auto Loans, Inc. (affiliate of Defendants)

136. Wasmuth, Edward H., Jr., Esq. (counsel for Defendants)

137. Wisconsin Auto Title Loans, Inc. (Defendant)

138. XL Group, plc  (NYSE Ticker: XL) (parent of insurer)

139. 514Cash.com, LLC (affiliate of Defendants)

140. All covered members of the armed services and their dependents who, between October 1, 2007 and January 2, 2013, entered into, rolled over, renewed, refinanced, or consolidated a vehicle title loan by any means with a Defendant that imposed an annual percentage rate of greater than 36 percent and required the title of a vehicle as security for the obligation for a term of 181 days or less.  For purposes of this class definition, a covered member of the armed services is a member of the armed forces who is (A) on active duty under a call or order that does not specify a period of 30 days or less; or (B) on active Guard and Reserve Duty.  A dependent of a covered member means the covered member's spouse, child, or an individual for whom the member provided more than one-half of the individual's support for 180 days immediately preceding the extension of consumer credit.  For purposes of this class definition, the phrase "vehicle title loan by any means" includes vehicle title loans, vehicle title pawns, and vehicle title pledges, and the phrase "covered members" does not include individuals who executed a statement at the time of the transaction indicating that they were not affiliated with the military.  (The Class certified by the district court.)

This 18th day of August, 2014.

Respectfully submitted,

SMITH, GAMBRELL & RUSSELL, LLP


/s/ *David C. Newman*
Stephen M. Forte
Georgia Bar No. 270035
Edward H. Wasmuth, Jr.
Georgia Bar No. 739636
David C. Newman
Georgia Bar No. 541148
Colin R.P. Delaney
Georgia Bar No. 216858

1230 Peachtree Street, N.E.
Promenade, Suite 3100
Atlanta, Georgia  30309-3592
Telephone: 404-815-3500
Facsimile:  404-815-3509

sforte@sgrlaw.com
ewasmuth@sgrlaw.com
dnewman@sgrlaw.com
cdelaney@sgrlaw.com

*Attorneys for Defendants/Appellants*

# STATEMENT REGARDING ORAL ARGUMENT

Defendants/Appellants request oral argument.  This Rule 23(f) appeal from an Order granting class certification under Rule 23(b)(3) presents several unsettled legal issues "important to the particular litigation as well as important in [themselves]."  *Prado-Steinman v. Bush*, 221 F.3d 1266, 1275 (11th Cir. 2000). The twin themes running through the errors assigned are whether Plaintiffs failed to carry their burden of proving the appropriateness of class certification and whether the district court conducted the necessary rigorous analysis.  Plaintiffs' papers below and the district court's Order leave far too much unexplained, unclear, or unaddressed.  This case also presents questions of first impression regarding whether the Military Lending Act, 10 U.S.C. §987 (2007), contains an implied private right of action.  Oral argument on these issues will give the Court the fullest opportunity to explore with counsel the substantial weaknesses, *see Prado-Steinman*, 221 F.3d at 1274, in the lengthy but often nebulous or opaque class-certification decision and determine whether the district court applied the incorrect Rule 23 standard or overlooked directly controlling precedent, *see id.* at 1274-75.  Considering the range of certification issues presented and the likelihood that the Court's decision will substantially advance the development of class-action law, oral argument will give the Court the chance to inquire about the specifics of this case and the broader implications of this appeal.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT .................................................. C-1

STATEMENT REGARDING ORAL ARGUMENT ............................................... i

TABLE OF AUTHORITIES ................................................................... iv

TABLE OF RECORD REFERENCES IN THE BRIEF ....................................... xi

JURISDICTIONAL STATEMENT ......................................................... 1

QUESTIONS PRESENTED ................................................................... 2

STATEMENT OF THE CASE ................................................................ 4

STATEMENT OF FACTS .................................................................... 9

STANDARD OF REVIEW .................................................................. 11

SUMMARY OF THE ARGUMENT .......................................................... 13

ARGUMENT ................................................................................ 15

I.    Plaintiffs did not show good cause for their late strategic change
      from Rule 23(b)(2) to (b)(3). ..................................................... 15

II.   No common claim exists, because the MLA does not contain an
      implied private right of action. ................................................. 21

      A.    The court erred in finding an implied private right of action. .......... 22

            1. The MLA fails the *Sandoval* and *Love* test for finding a
               private right to sue implied by the text of the statute. .................. 22

               a. The text contains no rights- or remedy-creating language. . ... 24

               b. The MLA has a strong public enforcement mechanism. ........ 29

               c. Statutory context points away from implied rights of action. . 30

   d. Plaintiffs cannot get past the *Sandoval* and *Love* test. ............ 33

  2. If *TransAmerica* remains good law after *Sandoval*, the implied private right is a limited one for rescission and restitution. ......... 33

 B. The court's private-right-of-action ruling stopped short of deciding the crucial question: What, if any, common remedy is available? ... 36

III. The district court failed to identify common claims, issues, and defenses. 39

IV. The district court's analysis of commonality and typicality was flawed. ... 41

 A. Finding commonality required all-but-resolving dissimilar merits issues across the various jurisdictions. ............................................. 41

  1. The MLA does not apply to pawns, pledges, or Texas services. . 44

  2. The district court's different rulings on applicability of the MLA show the lack of commonality and typicality. . .................. 47

 B. Plaintiffs' claims are typical only in the Pawn Jurisdictions; there are no class representatives elsewhere. .................................... 50

V. The district court failed to conduct a rigorous analysis of predominance. . 52

VI. The district court failed to conduct a rigorous analysis of superiority and manageability. ...................................................................................... 57

VII. The district court committed clear error in finding a class including military dependents ascertainable. ............................................................. 61

RELIEF REQUESTED............................................................................................ 65

# TABLE OF AUTHORITIES

## Cases

*Air España v. Brien*,
   165 F.3d 148 (2nd Cir. 1999) ......................................................54

*Alexander v. Sandoval*,
   121 S.Ct. 1511 (2001) .........................................................*passim*

*American Pipe & Constr. Co. v. Utah*,
   94 S.Ct. 756 (1974) ...........................................................17 n.7

*Amgen, Inc. v. Connecticut Retirement Plans & Trust Funds*,
   133 S.Ct 1184 (2013) .............................................................50

*Andrews v. AT&T Co.*,
   95 F.3d 1014 (11th Cir. 1996) ..................................................58

*Andrews v. Chevy Chase Bank*,
   545 F.3d 570 (7th Cir. 2008) ...................................................38

*Babineau v. Federal Exp. Corp.*,
   576 F.3d 1183 (11th Cir. 2009) .............................................53, 56

*Bearden v. Honeywell Int'l, Inc.*,
   702 F.Supp.2d 932 (M.D. Tenn. 2010) ......................................38

*Brown v. Lewis*,
   2009 WL 1457139 (M.D. Ga. 2009) .........................................31

*Bruce v. County of Rensselaer*,
   2003 WL 22436281 (N.D.N.Y. 2003) .......................................19

*Buford v. H&R Block, Inc.*,
   168 F.R.D. 340 (S.D. Ga 1996) ................................................57

*Butts v. County of Volusia*,
   222 F.3d 891 (11th Cir. 2000) .................................................19

*Cathey v. First Republic Bank*,
　　2001 WL 36260354 (W.D. La. 2001) .............................................31-32 n.12

*Chapman v. First Index, Inc.*,
　　2014 WL 3511227 (E.D. Ill. 2014) .......................................................18-19

*Christ v. Beneficial Corp.*,
　　547 F.3d 1291 (11th Cir. 2008) .......................................................12, 38, 50

*Comcast Corp. v. Behrend*,
　　133 S.Ct. 1426 (2013) ...........................................................................8, 37

*D.L. v. District of Columbia*,
　　713 F.3d 120 (D.C. Cir. 2013) ...................................................................42

*Ealy v. Pinkerton Gov't Servs., Inc.*,
　　514 F. App'x 299 (4th Cir. 2013) ................................................................56

*Fisher v. CIBA Specialty Chemicals Corp.*,
　　238 F.R.D. 273 (S.D. Ala. 2006) .................................................................62

*Frazier v. HSBC Mortg. Serv., Inc.*,
　　2009 WL 4015574 (M.D. Fla. 2009) ...................................................31 n.12

*Gawry v. Countrywide Home Loans, Inc.*,
　　640 F.Supp.2d 942 (N.D. Ohio 2009) ...................................................38, 55

*General Tel. Co. v. Falcon*,
　　102 S.Ct. 2364 (1982) ................................................................................8

*Gonzaga Univ. v. Doe*,
　　122 S.Ct. 2268 (2002) ..............................................................................27

*Grimes v. Rave Motion Pictures Birmingham, LLC*,
　　264 F.R.D. 659 (N.D. Ala. 2010) ...............................................................62

*Hayes v. Wal-Mart Stores, Inc.*,
　　725 F.3d 349 (3d Cir. 2013) ......................................................................64

*Hedvat v. Rothschild*,
   175 F.R.D. 183 (S.D.N.Y. 1997) ..................................................................19

*Hurley v. Deutsche Bank Trust Co.*,
   2009 WL 701006 (W.D. Mich. 2009) ...............................................32 n.13

*In re Aqua Dots Litig.*,
   270 F.R.D. 377 (N.D. Ill. 2010) ...................................................................37

*In re ConAgra Peanut Butter Litig.*,
   251 F.R.D. 689 (N.D. Ga. 2008) .................................................................37

*In re Mexcio City Aircrash of October 31, 1979*,
   708 F.2d 400 (9th Cir. 1983) .......................................................................28

*In re Pharma. Indus. Avg. Wholesale Price Litig.*,
   588 F.3d 24 (1st Cir. 2009) ..........................................................................39

*Jackson v. Motel 6 Multipurpose, Inc.*,
   130 F.3d 999 (11th Cir. 1997) .....................................................................11

*James v. Home Constr. Co.*,
   621 F.2d 727 (5th Cir. 1980) .......................................................................38

*Johnson v. American Credit Co.*,
   581 F.2d 526 (5th Cir. 1978) .......................................................................51

*Johnson v. Mammoth Recreations, Inc.*,
   975 F.2d 604 (9th Cir. 1992) .......................................................................15

*Klay v. Humana, Inc.*,
   382 F.3d 1241 (11th Cir. 2004) ............................................................53, 56

*Klay v. United Healthgroup, Inc.*,
   376 F.3d 1092 (11th Cir. 2004) ...................................................................12

*Krzyzanowski v. Orkin Exterminating Co.*,
   2009 WL 4573318 (N.D. Cal. 2009) .......................................................15-16

*Liporatav v. United States*,
    105 S.Ct. 2084 (1985) ..................................................................54

*Little v. T-Mobile USA, Inc.*,
    691 F.3d 1302 (11th Cir. 2012) ..........................................61-62

*Lovick v. RiteMoney Ltd.*,
    378 F.3d 433 (5th Cir. 2004) ......................................................46

*Love v. Delta Air Lines, Inc.*,
    310 F.3d 1347 (11th Cir. 2002) ...........................................*passim*

*Marcus v. BMW of North America, LLC*,
    687 F.3d 583 (3d Cir. 2012) ......................................................62

*Mogel v. Unum Life Ins. Co.*,
    677 F.Supp.2d 362 (D. Mass. 2009) .........................................19

*Moll v. Ford Consumer Finance Co.*,
    1998 WL 142411 (N.D. Ill. 1998) ......................................32 n.12

*Oregon Natural Res. Council v. U.S. Forest Serv.*,
    834 F.2d 842 (9th Cir. 1987) ......................................................28

*PMC, Inc. v. Sherwin-Williams Co.*,
    151 F.3d 610 (7th Cir. 1998) ......................................................28

*Prado-Steinman v. Bush*,
    221 F.3d 1266 (11th Cir. 2000) ...................................................1

*Premier Health Center, P.C. v. United Health Group*,
    292 F.R.D. 204 (D.N.J. 2013) ..............................................54-55

*Rioux v. City of Atlanta*,
    520 F.3d 1269 (11th Cir. 2008) .................................................12

*Robinson v. Texas Auto Dealers Ass'n*,
    387 F.3d 416 (5th Cir. 2004) ......................................................59

*Ross v. RBS Citizens, N.A.*,
    667 F.3d 900 (7th Cir. 2012) ........................................................39

*Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*,
    601 F.3d 1159 (11th Cir. 2010) ................................11, 49-50, 53-54, 55, 60

*Schramm v. JPMorgan Chase Bank, N.A.*,
    2011 WL 5034663 (C.D. Cal. 2011) ..........................................................38

*Sigall v. Zipcar, Inc.*,
    2014 WL 700331 (S.D.N.Y. 2014) ..........................................................27-28

*Smith v. Oppenheimer Funds Distr., Inc.*,
    824 F.Supp.2d 511 (S.D.N.Y. 2011) ....................................................33, 34

*Sosa v. Airprint Sys., Inc.*,
    133 F.3d 1417 (11th Cir. 1998)....................................................................15

*Stalley v. ADS Alliance Data Systems, Inc.*,
    2013 WL 6184065 (N.D. Fla. 2013) ..........................................................62

*Thompson v. Bayer Corp.*,
    2009 WL 362982 (E.D. Ark. 2009) ............................................................37

*TransAmerica Mortgage Advisors, Inc. v. Lewis*,
    100 S.Ct. 242 (1979) ..............................................................................*passim*

*U.S. v. B.C. Enters., Inc.*,
    696 F.Supp.2d 593 (E.D. Va. 2010) ....................................................29 n.10

*U.S. Bank v. Gilliam*,
    2012 WL 1067669 (N.D. Cal. 2012) ....................................................32 n.13

*Valley Drug Co. v. Geneva Pharms. Inc.*,
    350 F.3d 1181 (11th Cir. 2003) ..................................................................11

*Vega v. T-Mobile USA, Inc.*,
    563 F.3d 1256 (11th Cir. 2009) ..............................................................*passim*

*Wachtel v. Guardian Life Ins. Co.*,
    453 F.3d 179 (3d Cir. 2006) ..........................................................39

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S.Ct. 2541 (2011) ...........................................................*passim*

*Washington v. Vogel*,
    158 F.R.D. 689 (M.D. Fla. 1994) ..................................................19

*Wells v. Rockefeller*,
    728 F.2d 209 (3d Cir. 1984) ..........................................................19

*Williams v. U.S. Bank*,
    2013 WL 571844 (C.D. Cal. 2013) ........................................32 n.13

*Wisniewski v. Rodale, Inc.*,
    510 F.3d 294 (3d Cir. 2007) ..........................................................23

*Zinser v. Accufix Research Inst., Inc.*,
    252 F.3d 1180 (9th Cir. 2001) ......................................................59

## <u>Statutes</u>

10 U.S.C. §987 (2007).............................................................*passim*

10 U.S.C. §987(f)(5) (2013) ..................................................22, 32

15 U.S.C. §1640 ........................................................................31

18 U.S.C. §1961, *et seq.* ............................................................1

18 U.S.C. §1964(a) .....................................................................1

28 U.S.C. §1292(e) .....................................................................1

28 U.S.C. §1331...........................................................................1

28 U.S.C. §1367 ..........................................................................1

50 U.S.C. §501, *et seq.* .............................................................30

Ala. Code §5-19A-1, *et seq.* ..............................................................44, 45

Miss. Code. Ann. §75-67-403, *et seq.* ......................................45, 45-46

O.C.G.A. §44-12-130, *et seq.* ........................................................44, 45

O.C.G.A. §44-14-403 ..............................................................................45

P.R. Pub. L. 23 (2011) ....................................................................44, 45

Tenn. Code Ann. §45-15-103, *et seq.* ...................................................45

Tex. Fin. Code Ann. §393.001, *et seq.* ................................................46

## Rules

Fed. R. Civ. P. 16 ........................................................2, 5, 13, 15, 18

Fed. R. Civ. P. 23 ...............................................................*passim*

## Regulations

32 C.F.R. §232.3 ......................................................42-43, 43, 45, 48

32 C.F.R. §232.5 ......................................................................................9

## Other Authority

5 A. Corbin, Contracts, §1114 (1964) ...................................35, 35 n.15

Black's Law Dictionary (9th Ed. 2009) ......................................43, 55

Pub. L. 112-239, Div. A, Title VI, §662(c) .........................................22

# TABLE OF RECORD REFERENCES IN THE BRIEF

| Docket No. | | Brief Page No. |
|---|---|---|
| 1 | Verified Complaint for Damages and Corresponding Request for Declaratory and Injunctive Relief | 4, 16 |
| 18 | Verified Amended Complaint for Damages and Corresponding Request for Declaratory and Injunctive Relief | 4, 16, 60 |
| 76 | Second Amended Complaint for Damages and Corresponding Request for Declaratory and Injunctive Relief | 4, 16, 60 |
| 101 | Consent Order Modifying Remaining Deadlines under Case Management Order | 15 n.4 |
| 113 | Plaintiffs' Motion for Class Certification | 4, 16 |
| 115 | Memorandum of Law in Support of Plaintiffs' Motion for Class Certification | 41, 49 n.17, 60 |
| 122-3 | Department of Defense Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents (Aug. 9, 2006) – Exhibit 40 in Support of Plaintiffs' Motion for Class Certification | 30 |
| 127 | March 15, 2013 Status Report and Joint Motion for Stay | 63 |
| 131 | May 24, 2013 Status Report and Joint Motion for Continuation of Stay | 63 |
| 134 | June 28, 2013 Status Report and Joint Motion for Continuation of Stay | 63 |
| 139 | Defendants' Motion for Partial Summary Judgment on Counts II and VI Regarding Whether the MLA Creates a Private Right of Action and, if so, the Extent of Relief Available | 5, 6 n.1. 12 |

| 144 | Consent Order Modifying Certain Deadlines | 5, 16 n.5 |
|---|---|---|
| 146 | Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts Submitted in Opposition to Defendants' Motion for Partial Summary Judgment on Counts II and VI | 21 |
| 166 | Defendants' Brief in Opposition to Plaintiffs' Motion for Class Certification | 5, 6 n.1, 41 |
| 166-1 | Declaration of Terry Fields | 45, 46 |
| 169 | Deposition of Plaintiff Estevan Castillo | 55 n.19 |
| 175 | Plaintiffs' Reply in Support of Class Certification | 16, 60 |
| 180 | Plaintiffs' Motion for Declaratory and Injunctive Relief | 5 |
| 184 | Defendants' Motion for Summary Judgment on the Merits | 5, 6 n.1 |
| 187 | Hearing Transcript on Motion for Class Certification under Rule 23(b)(2) | *passim* |
| 189-1 | Third Declaration of Terry Fields | 10, 63 |
| 190 | Plaintiffs' Motion to Amend the Second Amended Complaint | 6, 16, 18 |
| 190-1 | (Proposed) Third Amended Complaint for Damages and Corresponding Request for Declaratory and Injunctive Relief | 60 |
| 191 | Plaintiffs' Supplemental Brief in Support of Class Certification and Brief in Support of Motion for Leave to Amend Plaintiffs' Second Amended Complaint | 6, 18, 52-53 |
| 198 | Defendants' Response in Opposition to Plaintiffs' Motion for Leave to Amend Complaint a Third Time | 18, 57 n.20 |

| 199 | Defendants' Response to Plaintiffs' Supplemental Brief on Class Certification | 6 n.1, 52, 57 n.20 |
| 201 | Consolidated Statement of Undisputed Material Facts Pertinent to Defendants' Motion for Summary Judgment on the Merits | 44, 46, 47 |
| 204 | Order on Class Certification | *passim* |
| 205 | Third Amended Complaint | 1 |

# JURISDICTIONAL STATEMENT

The district court has original jurisdiction over this case under 28 U.S.C. §1331 and 18 U.S.C. §1964(a), in that Plaintiffs' Third Amended Complaint asserts claims under the RICO Act, 18 U.S.C. §1961 *et seq.*, and purported causes of action under the Military Lending Act, 10 U.S.C. §987. (R.205.) The court has supplemental jurisdiction over Plaintiffs' other claims under 28 U.S.C. §1367.

On March 24, 2014, the district court entered an Order certifying a class under Rule 23(b)(3). (R.204.) Defendants timely petitioned for permission to appeal under Rule 23(f). (Case #14-90008.) Having granted the petition on July 9, 2014, this Court has jurisdiction over this appeal under 28 U.S.C. §1292(e).

# QUESTIONS PRESENTED

**I.**     Rule 16 requires good cause, including diligence, for modifying a scheduling order.  Plaintiffs made a strategic decision to not assert Rule 23(b)(3) as grounds for class certification until (b)(2) certification floundered at the class-certification hearing two years into the case.  Did the district court err in finding good cause to permit untimely assertion of (b)(3)?

**II.**     The district court apparently found commonality in an implied private right of action for violations of the MLA.  Under *Sandoval*, to imply a private right of action, the statutory text, structure, and context must indicate Congressional intent to create private rights and remedies.  While saving remedies under other laws, the MLA contains no rights-creating language and only a public remedy via criminal enforcement.  Did the district court err in finding an implied private right of action for damages (or maybe unjust enrichment) as a class-wide common claim?

**III.**   Did the district court err in certifying a class without identifying any common claims, issues, or defenses, as required by Rule 23(c)(1)(B)?

**IV.**   To find commonality, *Dukes* requires not just a common question but the capacity to generate common answers on a class-wide basis.  Without addressing commonality directly, the Order certified a single class of customers from pawn jurisdictions, pledge states, loan states, and Texas by "rejecting"

different defenses to applicability of the MLA. Did the district court err by going too far into the merits to certify a class across those jurisdictions despite uncommon questions as between the groups?

**V./VI.** Plaintiffs bear the burden of proving predominance and superiority, and the district court is responsible for conducting a "rigorous analysis" of those Rule 23(b)(3) requirements. Making a cursory showing, Plaintiffs established neither. The Order states bare conclusions in a sentence and a half. Did the district court err in certifying a class that must prove personalized elements and overcome individualized defenses?

**VII.** Class members must be ascertainable. Plaintiffs admit an ascertainability problem for dependents, and the only evidence showed that information necessary to identify dependents does not exist. Did the district court err in certifying a class that includes military dependents?

Plaintiffs, who pawned vehicle titles in Alabama and Georgia, seek damages and declaratory and injunctive relief concerning alleged violations of the Military Lending Act, 10 U.S.C. §987, which regulates three forms of credit extended to servicemembers and their dependents. The stated intent in filing this putative class action was "to stop and deter the Defendants from making title loans to…servicemembers in violation of the MLA." (R.1 at 1.) What Plaintiffs presumably did not know is that Defendants' title *loan* business with servicemembers had stopped four years earlier, when the MLA went into effect, and only the title *pawn* business in Alabama, Georgia, and Puerto Rico (which does not involve credit or debt regulated by the MLA) went on until December 2011.

For over two years, Plaintiffs asserted only two counts of the six-count Complaint on behalf of the putative class. (R.1, 18, 76 (Counts II & VI).) Both purported to state causes of action for violations of the MLA. Plaintiffs sought, for themselves and putative classes comprised of active-duty servicemembers and dependents, declaratory relief (that contracts were void), injunctive relief (requiring return of car titles and all money paid), and supposedly "incidental" damages. Plaintiffs did not plead their RICO claim or state-law claims on behalf of the putative class. When Plaintiffs moved for class certification (R.113), the

sole ground advanced was Rule 23(b)(2).  Plaintiffs disavowed certification under Rule 23(b)(3).

Defendants opposed (b)(2) certification on various grounds.  (R.166.)  After a hearing, the district court correctly denied certification under Rule 23(b)(2), finding the damages sought "individualized claims for money, which, according to the Supreme Court, 'belong in Rule 23(b)(3)' and not Rule 23(b)(2)."  (R.204: the "Order" 30-32 (citing *Wal-Mart Stores v. Dukes*).)

The hearing on Plaintiffs' motion to certify under Rule 23(b)(2) was held two years after this case was filed.  At that point, discovery—on class certification and the merits—was complete and closed.  (R.144.)  Plaintiffs had moved for declaratory judgment and a permanent injunction.  (R.180.)  Defendants had moved for summary judgment on the merits (R.184), following a separate motion to determine whether the MLA contains an implied private right of action. (R.139.)  Toward the end of the hearing, Plaintiffs stated their intent to "stick with our (b)(2)" but suggested that the court could certify under (b)(3) and sought permission to submit a brief that would "provide the Court with an alternative." (R.187: Hr'g 98.)

Nearly ten months after the Rule 16 deadline to move for class certification and a month after the class-certification hearing, Plaintiffs filed a supplemental brief proposing certification under Rule 23(b)(3) and separately moved to amend

the Complaint a third time to allege (b)(3) as grounds for certification and assert the RICO claim on behalf of the putative class. (R.190, 191.) Plaintiffs also suggested two new sub-classes of customers who had signed a Covered Borrower Identification Statement ("CBIS") denying active-duty or dependent status.

The district court entered a single Order deciding or terminating all pending motions. (R.204: Order.) The court granted leave to assert class claims under Rule 23(b)(3). (Order 32-33.) The court denied Defendant's motion for partial summary judgment on whether the MLA creates a private right of action and denied in part Defendants' motion for summary judgment on the merits.[1] (Order 3-20.) The court granted summary judgment to Defendants on the RICO claim.[2] (Order 20-28.) The court declined to certify two proposed classes of customers who had signed a CBIS denying connections with the military. (Order 36-39.) At Plaintiffs' request, the court cut off the class period on the effective date of an amendment to the MLA that created a private right of action. (Hr'g 60-61.)

---

[1] The district court erroneously described Defendants' summary-judgment motions as merits-based objections to class certification. (Order 3.) Defendants' arguments in the motion for partial summary judgment (R.139) and the separate motion for summary judgment on the merits (R.184) stand alone, apart from Defendants' opposition to class certification (R.166, 199). The district court correctly recognized, however, that the partial-summary-judgment motion presented an issue "inextricably intertwined" with class-certification: whether the MLA creates a private right of action. (Order 5.)

[2] The disposition of the RICO claim is not before the Court in this appeal.

Finally, the district court re-wrote Plaintiffs' proposed class definition to create a single class of servicemembers and dependents who consummated a vehicle title loan "by any means" with a Defendant in any of eighteen jurisdictions at an interest rate above 36 percent for a term of 181 days or less, provided the customer had not denied military connections on a signed CBIS.  (Order 35, 46.)

The Order does not identify any class claims, issues, or defenses, as required by Rule 23(c)(1)(B), or appoint class counsel.  The district court's treatment of various merits issues leaves unclear what has been decided and what remains for trial.  The court deals with the commonality and predominance requirements together in a single sentence, without supporting analysis.  Conclusions about manageability and superiority appear together in another sentence, also without supporting analysis.  Ascertainability gets a one-sentence conclusion based on a mistaken reading of the record.  Typicality and adequacy garner a half sentence each.  All of that appears in a section of the Order headed "Summary."  (Order 45.) The "Summary" does not, however, summarize any preceding discussion or analysis but rather reaches conclusions in summary fashion.  Whatever analysis the district court might have done on these issues, the Order is "opaque about the way in which the court conducted its Rule 23 analysis."  *Vega v. T-Mobile USA, Inc.*, 563 F.3d 1256, 1268 (11th Cir. 2009).

Given due consideration under the proper "rigorous analysis," *General Tel. Co. v. Falcon*, 102 S.Ct. 2364, 2372 (1982), Plaintiffs' inability to establish commonality, predominance, superiority, manageability, and ascertainability precludes certification of the class. Because the district court manifestly abused its discretion, this case presents the opportunity for this Court to give clear direction to district courts about what the rigorous analysis of class-certification issues must entail after *Comcast Corp. v. Behrend*, 133 S.Ct. 1426 (2013), and *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541 (2011).

## STATEMENT OF FACTS

The MLA generally makes it unlawful for a creditor to extend three forms of closed-end consumer credit with a term of 181 days or less to an active-duty servicemember or a servicemember's dependent at a specially calculated "military annual percentage rate" in excess of 36%. 10 U.S.C. §987. The MLA creates a safe harbor for creditors by rendering itself inapplicable to a transaction when the borrower signs a CBIS indicating that he or she is not on an active-duty servicemember or a servicemember's dependent. 32 C.F.R. §232.5.

When the MLA first came into effect in 2007, Community Loans of America, Inc. ("CLA"), implemented a compliance program directing operating affiliates to require prospective customers to complete a CBIS before consummating a title loan, as contemplated by the MLA regulations. 32 C.F.R. §232.5(a). That compliance program applied to all operating Defendants in this case except those accepting pawns under Alabama, Georgia, and Puerto Rico law (the "Pawn Jurisdictions"). Because pawn transactions do not involve credit or debt, CLA determined, the MLA did not apply to business done in the Pawn Jurisdictions. As a result of the CBIS compliance program, Defendants collected millions of CBIS's from customers around the country, declining to make title loans to applicants who self-identified as covered borrowers, as Defendants do not offer loan products below 36% APR to any customer. Believing in good faith that

the MLA did not apply to pawns, three CLA operating entities continued to allow servicemembers and dependents to pawn vehicle titles, though they represented a tiny fraction of the pawn business. A very small number of those resulted in repossessions. (R.189-1 ¶3.)

The month after this case was filed challenging CLA's understanding that the MLA does not apply to pawns, the CBIS program was expanded to the Pawn Jurisdictions. Except for a limited number of *bona fide* errors, business with servicemembers and dependents ceased in the Pawn Jurisdictions almost three years ago. As a result of the CBIS compliance program, the vast majority of transactions at issue took place in the Pawn Jurisdictions between October 2007 and December 2011. Outside those areas and that period, Defendants' transactions with servicemembers and dependents fit into two categories: (1) *bona fide* mistakes occurring at an extremely low error rate, and (2) deception on the part of customers signing CBIS's that misrepresented their status. Taking compliance with the MLA very seriously, Defendants had and have no intention of carrying on business forbidden by the MLA. (R.189-1 ¶4.)

## STANDARD OF REVIEW

"Recognizing the awesome power of a district court in controlling the availability of the class action mechanism, [this Court] require[s] that decisions to certify a class rest on a rigorous analysis of the requirements of Rule 23." *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1169 (11th Cir. 2010) (internal quotations, citations omitted). The Named Plaintiffs bear the burden of proving that the putative class, and each subclass, satisfies those prerequisites. *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1187 (11th Cir. 2003). "A class action may be maintained only when it satisfies all the requirements of FED. R. CIV. P. 23(a) and at least one of the alternative requirements of Rule 23(b)." *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir. 1997).

A grant of class certification is reviewed for abuse of discretion:

A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous. A district court may also abuse its discretion by applying the law in an unreasonable or incorrect manner. Finally, an abuse of discretion occurs if the district court imposes some harm, disadvantage, or restriction upon someone that is unnecessarily broad or does not result in any offsetting gain to anyone else or society at large. In making these assessments, [this Court] review[s] the district court's factual determinations for clear error, and its purely legal determinations *de novo*.

*Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1096 (11th Cir. 2004). This Court "review[s] the procedures the district court undertook in conducting the Rule 23 analysis, whether the conclusions it reached were within its discretion given the mandates of Rule 23, and whether [] the complaint, as pled, can sustain class action certification under Rule 23." *Vega*, 564 F.3d at 1265.

Before briefing class certification, Defendants moved for partial summary judgment on an issue central to class certification (commonality) and their defense on the merits: Plaintiffs have no private right of action for alleged violations of the MLA. In the alternative, if an implied right of action exists, the remedy is limited to rescission and restitution. (R.139.) This Court reviews denial of summary judgment *de novo*. *Rioux v. City of Atlanta*, 520 F.3d 1269, 1274 (11th Cir. 2008); *cf. Christ v. Beneficial Corp.*, 547 F.3d 1292, 1298 (11th Cir. 2008) (reviewing *de novo* whether private right of action for relief requested exists and vacating class certification for abuse of discretion because it does not).[3]

---

[3] The *de novo* standard applies to the issues raised in Part II, *infra*. The *Klay v. United Healthgroup* abuse-of-discretion standard applies to the issues raised in all other Parts.

## SUMMARY OF THE ARGUMENT

Class certification in this case resulted from twin failures: Plaintiffs' failure to establish the required elements of Rule 23, and the district court's failure to subject Plaintiffs' proof and arguments to the necessary "rigorous analysis." The result is a class that should not have been certified.

**I.** Having disavowed certification under Rule 23(b)(3) for strategic reasons, Plaintiffs could not show diligence, hence good cause under Rule 16, for seeking a (b)(3) class two years into this case, ten months after the deadline, just because certification under (b)(2) was floundering.

**II.** Since the text, structure, and context of the MLA all point away from Congressional intent to create a private right of action, no common claim binds the class together to permit class certification.

**III.** The district court's failure to identify any common claims, issues, or defenses, as required by Rule 23(c)(1)(B), highlights fundamental flaws in its analysis of commonality, predominance, and superiority.

**IV.** The district court should not have "rejected" merits defenses to applicability of the MLA (such as the pawn issue) as a route to creating nationwide commonality. Material differences in contract terms and governing law make it impossible for a single class spanning the pawn jurisdictions, pledge states, loan states, and Texas to generate common answers on a class-wide basis to the

question whether the MLA was violated.  At a minimum, the material differences require sub-classes for those four groups, three of which lack a class representative.

**V.**  Plaintiffs' claims require proof of personalized circumstances. Several triable defenses are also individualized to each class member.  As a result, Plaintiffs could not show common questions (whatever they may be) predominating over individual ones, making (b)(3) certification inappropriate.

**VI.**  The necessity of mini-trials on numerous elements and defenses makes this case unmanageable.  Plaintiffs' failure to propose a trial plan or show manageability some other way should have prompted the district court to decline to certify a (b)(3) class.

**VII.**  Because the only evidence on ascertainability of dependents shows they can't be identified using available resources, the district court should not have certified a class that include dependents.

# ARGUMENT

## I. Plaintiffs did not show good cause for their late strategic change from Rule 23(b)(2) to (b)(3).

The district court correctly denied class certification under Rule 23(b)(2), the theory under which the parties litigated this case from the beginning through the class-certification hearing. (Order 30-32.) Plaintiffs nevertheless achieved class certification because the district court abused its discretion in finding good cause to permit an untimely strategic change and argument for certification under Rule 23(b)(3). (Order 32-33.) This case presents the opportunity to address the permissibility of an untimely case-altering switch to (b)(3) when certification under (b)(2) falters.

Rule 16(b)(3)(A) requires courts to enter a scheduling order limiting the time to join parties, amend pleadings, complete discovery, and file motions.[4] "A schedule may be modified only for good cause and with the judge's consent." FED. R. CIV. P. 16(b)(4). The good cause standard "precludes modification unless the schedule cannot 'be met despite the diligence of the party seeking the extension." *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1418 (11th Cir. 1998). "If [a] party was not diligent, the [good cause] inquiry should end." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992); *Krzyzanowski v. Orkin*

---

[4] The deadline for filing class-certification motions was February 18, 2013. (R.101.)

*Exterminating Co.*, 2009 WL 4573318, *1-2 (N.D. Cal. 2009) (denying motion to allow filing of class-certification motion after deadline passed, finding lack of diligence and good cause).

Plaintiffs' counsel made important, strategic decisions when they filed the initial Complaint in November 2011. (R.1.)  They sought class certification under Rule 23(b)(2), not (b)(3)—not even in the alternative.   They reaffirmed that decision in the January 2012 Amended Complaint and the November 2012 Second Amended Complaint.   (R.18, 76.)   They stuck by it in the Motion for Class Certification filed in February 2013.  (R.113.)  In their October 2013 reply brief on class certification, they acknowledged having "chosen not to assert a Rule 23(b)(3) damages class."  (R.175 at 12.)

Plaintiffs sought leave to assert class claims under Rule 23(b)(3) for the first time on December 20, 2013 (R.190), more than two years into the case, *ten months* after the deadline to file class-certification motions had passed, after discovery on class-certification issues and the merits had closed, with summary-judgment motions by both sides pending, and after the only class-certification hearing.[5]

_____

[5] The Order incorrectly states that "class certification discovery and some merits discovery [] proceed[ed] simultaneously." (Order 4.)  Discovery occurred at once on all matters and closed on October 4, 2013, the same day as Defendants briefed class certification. (R.144.)  Defendants agreed to single-track discovery and brief class certification at the end of the case precisely because Plaintiffs were pursuing a mandatory (b)(2) class, not a (b)(3) class entitled to notice and opt-out rights before significant merits decisions are made.

Having earlier disavowed it, Plaintiffs sought to switch to (b)(3) at the end of the November 20, 2013 hearing on class certification under (b)(2), when Plaintiffs' counsel realized from the court's questions that (b)(2) was in trouble.

The court asked Plaintiffs' counsel, "Why didn't you seek a (b)(3) class?" (Hr'g 45.[6]) Plaintiffs' counsel had made a considered strategic decision: "[Y]ou know, we brought it as a (b)(2) because we thought it was cleaner, and we brought it for declaratory injunctive relief with incidental damage." (Hr'g 48.) Whatever made pursuing certification under only (b)(2) "cleaner" in Plaintiffs' eyes, at a minimum it avoided the predominance and superiority requirements of (b)(3), early action on class-certification motions, and the expense of mandatory notice to absent class members under Rule 23(c)(2)(B).[7]

The court's skepticism about awarding the requested damages to a (b)(2) class (Hr'g 48-49) prompted counsel to reconsider the strategy and ask for permission to brief certification under (b)(3) (Hr'g 97-98). Plaintiffs later filed a brief amounting to a new motion for class certification under (b)(3), grounds not

---

[6] The district court also asked Defendants' counsel, "Why can't this be certified as a (b)(3) class?" (Hr'g 68.) Defendants immediately identified predominance and superiority as obvious impediments to certification under (b)(3). (Hr'g 69.)

[7] This deprived absent class members of the opportunity to opt-out before merits decisions and now subjects Defendants to one-way intervention since the RICO claim has been dismissed. *See American Pipe & Constr. Co. v. Utah*, 94 S.Ct. 756, 763-64 (1974) (deciding class certification early, before major merits decisions, avoids the problem of one-way intervention that frustrates the class mechanism).

previously even alleged. (R.191.) Though Plaintiffs made no effort to show good cause, through diligence or otherwise, the district court found "good cause" under Rule 16(b). (Order 32.)

The district court erred in stating, as the first reason to permit the late change, that "no one contends that additional discovery is necessary to support or oppose class certification under Rule 23(b)(3)." (Order 32.) Defendants did state a need to conduct discovery on various matters implicated by (b)(3), explaining that without such discovery the predominance and superiority analyses were impossible to conduct. (R.198 at 6.) The district court's second reason—that Plaintiffs were still seeking the same relief, just changing procedural vehicles—misses the point. (Order 33.) Seeking the same relief has nothing to do with Rule 16's good cause and diligence requirements to justify an untimely certification-strategy change from (b)(2) to (b)(3).

Other than the court's evident skepticism about (b)(2) and questions about certifying under (b)(3), nothing new emerged at the class-certification hearing warranting Plaintiffs' change to (b)(3). Plaintiffs could have included the (b)(3) theory as an alternative in their original motion and twice-amended complaint. Their repeated decisions against (b)(3) were strategic. Under these circumstances, Plaintiffs lacked diligence in not asserting (b)(3) earlier. Regrettable tactical decisions show not diligence but lack of it. *Chapman v. First Index, Inc.*, 2014

WL 3511227, *3 (E.D. Ill. 2014) (denying leave to amend proposed class definition "late in the game" because plaintiff could have amended earlier and made strategic decision not to); *accord Butts v. County of Volusia*, 222 F.3d 891, 892 n.2 (11th Cir. 2000) (bad strategies do not qualify as good cause).  Asserting class claims under Rule 23(b)(2) then switching to the previously disavowed (b)(3) because certification under (b)(2) flounders does not qualify as good cause.  *See Mogel v. Unum Life Ins. Co.*, 677 F.Supp.2d 362, 366-67 (D. Mass. 2009); *Washington v. Vogel*, 158 F.R.D. 689, 692-93 (M.D. Fla. 1994).

Fundamental fairness requires that litigants live with the consequences of strategic choices.  *See Wells v. Rockefeller*, 728 F.2d 209, 214 (3d Cir. 1984) ("[Plaintiff] followed this tactic as a matter of strategy; that being so, he must now live with its consequences."); *Bruce v. County of Rensselaer*, 2003 WL 22436281, *4 (N.D.N.Y. 2003) ("Having made that [strategy] choice, [Plaintiffs] must now live with the results."); *Hedvat v. Rothschild*, 175 F.R.D. 183, 191 (S.D.N.Y. 1997) (fact that "strategic choice may have been improvident cannot transform [a] bad strategic choice" into basis for relief).  Without good cause even offered by Plaintiffs, the district court abused its discretion in relieving Plaintiffs of the consequences of their strategic decisions and shifting the disadvantage to Defendants.

By vacating class certification under (b)(3) for lack of good cause to permit the assertion of (b)(3) so late and directing that no class be certified, this Court will relieve Defendants from the prejudice worked in this case.[8]  More broadly, vacating will shape class-action practice by discouraging switches to a (b)(3) opt-out class only after failing to secure certification of a (b)(2) mandatory class, well after the deadline for class-certification motions has passed and long after the "early practicable time" required by Rule 23(c)(1)(a).

---

[8] Defendants, too, made strategic decisions over the course of this case, choices made in reliance on Plaintiffs' decisions against pursuing (b)(3) certification.

**II.     No common claim exists, because the MLA does not contain an implied private right of action.**

Whether the MLA contained an implied private right of action is "inextricably intertwined" with class certification.  (Order 5.)  For without a private right of action, no common claim could bind together the class.

The common claim Plaintiffs envision is ambitious.  Plaintiffs seek a judgment requiring Defendants to "return all monies wrongfully collected from covered members" *without reduction to account for the money advanced by Defendants.*  (R.146 at 2.)  In other words, Plaintiffs don't want to rescind (unwind) the transactions.  Plaintiffs want back all the money the class paid and to keep (or take again) the money advanced by Defendants as the consideration in the transactions.  They want money flowing in one direction as some sort of private "punitive" remedy.  (Hr'g 26-28.)

The district court held that the MLA does contain an implied private right of action for damages and added that an unjust-enrichment remedy might be pursued as well.  (Order 10-12.[9])  The court's conclusion stands on four legs: (1) the MLA provision declaring void contracts in violation thereof; (2) the provision making arbitration agreements unenforceable; (3) the savings clause; and (4) the lack of an

_____

[9] The court denied partial summary judgment to Defendants but did not grant summary judgment to Plaintiffs, leaving unclear what has been resolved as a matter of law and what has not.

*administrative* enforcement regime in the pre-2013 MLA.  None of those supports finding an implied private right of action under the governing test.

### A.    The court erred in finding an implied private right of action.

Congress did not initially create an express private right of action for violations of the MLA.  In early 2013, Congress amended the MLA to create a private right of action.  10 U.S.C. §987(f)(5) (2013).  The newly created federal right and remedies apply only to extensions of credit made on or after January 2, 2013, meaning it is not available to Plaintiffs.  Pub. L. 112-239, Div. A, Title VI, §662(c).

Prior to the amendment, the penalties-and-remedies subsection of the MLA provided for (1) criminal sanctions, (2) preservation of remedies under other laws, (3) declaring void from inception any contract prohibited by the MLA, and (4) the unenforceability of agreements to arbitrate disputes involving transactions governed by the MLA.  10 U.S.C. §987(f) (2007).  Therefore, a private right of action exists for violations of the MLA in transactions prior to January 2, 2013, only if Congress *impliedly* created one upon initial enactment.

### 1.    The MLA fails the *Sandoval* and *Love* test for finding a private right to sue implied by the text of the statute.

Federal jurisprudence on implied private rights of action evolved for over fifty years, through successive refinements and restrictions by the Supreme Court that "substantially modified" the governing test.  *Wisniewski v. Rodale, Inc.*, 510

F.3d 294, 296-301 (3d Cir. 2007) (tracing changes and noting that the Court's "opinions have not always announced explicitly when they are overruling (or limiting to their facts) old precedents in this area").  The current test for whether an implied private right of action exists was announced in *Alexander v. Sandoval*, 121 S.Ct. 1511 (2001).  *Wisniewski*, 510 F.3d at 301.  *Sandoval* is the "culmination of a trend" toward "focusing exclusively on legislative intent to create a private right of action."  *Love v. Delta Air Lines, Inc.*, 310 F.3d 1347, 1351-52 (11th Cir. 2002).  The *Sandoval* Court's analysis began thus:

> Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress.  The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create *not just a private right but also a private remedy*.  Statutory intent on this latter point is determinative.  Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute.  Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals.

*Sandoval*, 121 S.Ct. at 1519-20 (quotations, citations omitted; emphasis added).

Limited by that analytical framework, the *Sandoval* Court began and ended its search for Congressional intent with the text and structure of the statute.  *Id.* at 1520-22.  The statute at issue did not contain any of the "rights-creating" language considered the most accurate indicator of Congressional intent to confer a right and remedy on a class of persons.  *Id.* at 1521.  "Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to

confer rights on a particular class of persons," the Supreme Court reasoned. *Id.* (internal quotation omitted). Nor did the statute manifest an intent to create a private remedy. On the contrary, a section specifying agency enforcement reflected intent to *not* create a private right of action. *Id.* at 1521-22. In the absence of language creating private rights and a private remedy, the *Sandoval* Court concluded that Congress did not intend to create a private right of action, so no such implied right existed. *Id.* at 1523.

*Sandoval* refocused the test, concentrating on "legislative intent to create a private right of action as *the* touchstone of [the] analysis." *Love*, 310 F.3d at 1352. *Sandoval* "clearly delimits the sources that are relevant to [the] search for legislative intent," guiding courts to consider three issues of diminishing relative importance: (1) whether the statutory text contains rights- and remedy-creating language, (2) whether the statutory structure contains a discernible enforcement mechanism other than a private right of action, and (3) whether the context within which the statute was passed clarifies the text sufficiently to conclude that Congress intended to create a private right and a private remedy. *Id.* at 1352-53.

<u>a.</u> <u>The text contains no rights- or remedy-creating language.</u>

The district court failed to apply to first part of the *Love* test. The text of the MLA focuses on the actor subjected to criminal sanction and the conduct proscribed. In the MLA, the actor is the creditor, and the conduct is the extension

of credit.  The four substantive provisions of the MLA focus on what a creditor

cannot do:

> **§987(a):** A <u>creditor</u> <u>who extends consumer credit</u> to a covered
> member of the armed forces or a dependent of such member <u>shall not</u>
> <u>require</u> the member or dependent to pay interest with respect to the
> extension of credit, except as—...
>
> **§987(b):** <u>A creditor</u> described in subsection (a) <u>may not impose</u> an
> annual percentage rate of interest greater than 36 percent with respect
> to the consumer credit extended to a covered member or dependent of
> a covered member.
>
> **§987(c)(1):**  With respect to any extension of consumer credit…to a
> covered member or dependent of a covered member, <u>a creditor</u> <u>shall</u>
> <u>provide</u> to the member or dependent the following...
>
> **§987(e):** It shall be <u>unlawful for any creditor</u> <u>to extend consumer</u>
> <u>credit</u> to a covered member or a dependent of a member with respect
> to which—
>
>> (1)  <u>the creditor rolls over</u>, renews, repays, refinances, or
>> consolidates any consumer credit extended to the borrower by the
>> same creditor...;
>>
>> (2)  the <u>borrower is required</u> [by the creditor] to waive the
>> borrower's rights...;
>>
>> (3) the <u>creditor requires the borrower</u> to...;
>>
>> (4) the <u>creditor demands</u> unreasonable notice...;
>>
>> (5) the <u>creditor uses</u>...access to [an] account maintained by the
>> borrower, or the title of a vehicle as security for the obligation;
>>
>> (6) the <u>creditor requires</u>...that the borrower establish an allotment
>> to repay an obligation; or
>>
>> (7) the <u>borrower is prohibited</u> [by the creditor] from prepaying the
>> loan or is charged a penalty or fee for prepaying all or part of the
>> loan.

In three of those sections, the subject of the sentence is the creditor, the object is

the creditor's conduct.  The fourth declares unlawful certain activities undertaken

by creditors.  The only departures from the strong textual focus on the creditor and

the extension of credit are two subsections, §987(e)(2) & (7), that refer to the

borrower. Each of those remains focused on what the creditor may not do. None of those provisions has any rights- or remedy-creating language. Instead they define who faces criminal liability for which acts. By focusing on the creditor and activity regulated, not the customers, the statutory text does not imply intent to confer rights on a class of persons. *Sandoval*, 121 S.Ct. at 1521. This text devoid of rights- and remedy-creating language leads to but one conclusion: Congress did not create a private right of action.

The original penalties-and-remedies subsection used more varied phraseology than the substantive sections. But the focus still remained on the creditor and its conduct. The only remedy expressly created by the original MLA is a public one: criminal sanctions on "a creditor who knowingly violates this section…." 10 U.S.C. §987(f)(1). Two other provisions of that subsection declare certain contracts void and certain arbitration agreements unenforceable without using any rights- or remedy-creating language. 10 U.S.C. §987(f)(3), (4). The sole remaining subsection, the savings clause, refers to a "person claiming relief under [the MLA]" but does so only in reference to the preservation of rights and remedies available under other laws. 10 U.S.C. §987(f)(2). Nothing in the penalties-and-remedies subsection gives any hint that Congress intended to *create* private remedies, as distinguished from preserving remedies available under other law. In preserving private remedies available under other laws, Congress plainly

considered and addressed the issue of private remedies *without* creating any new and additional private remedies in the MLA.

The district court acknowledged that "the specific type of remedy is not mentioned in the MLA." (Order 12.) Under *Sandoval* and *Love*, that should have ended the inquiry and compelled the conclusion that no private right of action exists. Without a private remedy in the MLA, the district court could not properly conclude that an implied private right of action exists. *Gonzaga Univ. v. Doe*, 122 S.Ct. 2268, 2275-76 (2002) (even when statute is phrased in explicit rights-creating terms, absent Congressional intent to create a private remedy, no private right of action exists).

The district court's analysis ignores all that, signally failing to identify *any* rights-creating language in the MLA. Reliance on the provisions declaring contracts void and arbitration clauses unenforceable is misplaced. Neither provision *creates* rights. Both *extinguish* rights. The first creates a defense to contract enforcement. The second ensures that the defense will be determined in court, not arbitration. Neither implies that Congress intended to create not just a defense but also a right and a remedy through an offensive cause of action for damages. Contrary to the district court's conclusion, even without a private right of action these provisions serve a purpose: creating a defense and ensuring disputes will be heard by courts. *Cf. Sigall v. Zipcar, Inc.*, 2014 WL 700331, *3 (S.D.N.Y.

2014) (statute deeming agreements void did not imply private right of action; distinction between creating a contract defense and conferring the right to sue reflects "the legislative bargain struck between competing policy interests").

The district court pointed to the MLA's savings clause, §987(f)(2), as an indication that "Congress obviously intended that a covered borrower could seek relief through litigation under the MLA." (Order 10-11.) The savings clause expresses intent to preserve rights of action under other laws—not to create litigation "under the MLA." "The purpose of a savings clause is merely to nix an inference that the statute in which it appears is intended to be the exclusive remedy for harms caused by a violation of the statute." *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 618 (7th Cir. 1998). A savings clause "does not evidence any intent to create a private cause of action. It simply preserves private remedies that exist independent of the Act." *In re Mexico City Aircrash of October 31, 1979*, 708 F.2d 400, 407 (9th Cir. 1983). Savings clauses do not create private rights of action, express or implied. *Oregon Natural Res. Council v. U.S. Forest Serv.*, 834 F.2d 842, 850-52 & n.15 (9th Cir. 1987). By their nature, savings clauses contain the polar opposite of the rights- and remedy-*creating* language *Sandoval* requires.

Had the district court faithfully applied the *Sandoval*/*Love* test, eschewing out-dated policy-and-purpose considerations, it would have concluded that nothing in the text of the pre-amendment MLA creates a private right or a private remedy.

The contrast with the post-amendment MLA—wherein a different Congress balanced competing policy interests differently—makes inescapable the conclusion that no implied private right of action existed in the pre-amendment MLA.

### b. The MLA has a strong public enforcement mechanism.

The district court applied the second part of the *Love* test but reached the wrong conclusion. The court considered the lack of an "administrative enforcement regime" a "significant" indicator of intent to create a private right of action. (Order 11.) The court wrongly ignored the MLA's express enforcement mechanism: criminal sanctions including fines and imprisonment. While not as "elaborate" as the civil regulatory enforcement mechanisms provided by the statute in *Love*, 310 F.3d at 1357, criminal prosecution, fines, and imprisonment are straightforward and powerful enforcement mechanisms.[10] Lack of *administrative* in addition to criminal enforcement does not imply creation of private enforcement. The heightened requirement of an "administrative enforcement regime" to disprove Congressional intent to create a private right of action finds no support in *Sandoval* or *Love*. By expressly providing a powerful enforcement mechanism, Congress evidently intended to preclude others, *Sandoval*, 121 S.Ct. at 1521-22, except those the savings clause took care not to preclude or preempt.

---

[10] The government may also have power to enforce the MLA through sovereign actions. *Cf. U.S. v. B.C. Enters., Inc.*, 696 F.Supp.2d 593, 598-99 (E.D. Va. 2010).

<u>c. Statutory context points away from implied rights of action.</u>

The extent to which the district court relied on the third part of the *Love* test—consideration of the legislative history and context—is unclear.[11]  The court simply noted that its conclusion "is consistent with the rationale of many district courts that have considered a similar provision in the Servicemembers Civil Relief Act ('SCRA'), 50 U.S.C. §501 *et seq*."  (Order 11.)

The Congressional Record gives no indication of intent to create private rights and remedies in the MLA as of initial enactment.  The Defense Department's 2006 "Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents," which heralded passage of the MLA, specifically urged inclusion of private remedies.  (R.122-3 at 46.)  But they were omitted from the statute—an indication from legislative history that Congress deliberately chose not to create private remedies.

The legislative context likewise indicates Congress did not intend to create private rights or remedies.  The Truth In Lending Act ("TILA") regulates some aspects of the same business.  The MLA even incorporates certain provisions of TILA.  10 U.S.C. §987(c)(1)(B), (c)(2) & (i)(4).  Congress expressly created

---

[11] *Sandoval* focused exclusively on statutory text and structure, leaving unclear what role legislative history may play. *Sandoval*, 121 S.Ct. at 1521 n.7.  Context is considered only to the extent it "clarifies text," *id*. at 1520, and should be considered "if—and *only* if" text and structure have not resolved the issue.  *Love*, 310 F.3d at 1352.

private rights and private remedies for violations of TILA. *See* 15 U.S.C. §1640. They were present in TILA when Congress enacted the MLA. Yet Congress did not incorporate those provisions into the MLA or make the MLA part of TILA. By enacting the MLA as a freestanding criminal statute and not providing for or incorporating the private rights and remedies available under the somewhat similar statute from which Congress drew specific terms, Congress manifested intent to *not* create by implication in the MLA rights and remedies it created expressly in TILA. *See TransAmerica Mortgage Advisors, Inc. v. Lewis*, 100 S.Ct. 242, 247-48 (1979) (omission of private remedies appearing in related statute "strongly suggests" Congress did not intend to create private rights of action for damages).

Ignoring the parallels with TILA, the district court seemingly adopted the reasoning of other district courts finding implied private rights of action in the SCRA. (Order 11-12; *but see Brown v. Lewis*, 2009 WL 1457139, *3 n.4 (M.D. Ga. 2009).) Inexplicably, none of the three cases cited by the court applied—or even mentioned—the correct *Sandoval* and *Love* analysis.[12] Other SCRA cases

---

[12] *See Frazier v. HSBC Mortg. Serv., Inc.*, 2009 WL 4015574 (M.D. Fla. 2009) (decided after *Sandoval* and *Love* but citing neither and applying outdated analysis); *Cathey v. First Republic Bank*, 2001 WL 36260354 (W.D. La. 2001) (decided after *Sandoval* but following pre-*Sandoval* decisions); *Moll v. Ford Consumer Finance Co.*, 1998 WL 142411 (N.D. Ill. 1998) (decided before *Sandoval*).

have ignored *Sandoval* too, even those finding no implied right of action.[13]  Since those decisions did not apply the proper analysis, they deserve no persuasive weight.

The most important legislative context is passage of the amendment actually creating private rights and remedies, six years after enactment of the MLA without them.  10 U.S.C. §987(f)(5) (eff. Jan. 2, 2013).  By amending the statute to create express rights and remedies while specifically providing that they apply only prospectively, Congress manifested its understanding that the original MLA did not provide for private rights and remedies and intent that prior transactions not be imbued with a private right of action.  The careful balancing seen in the amendment, such as the *bona fide* error defense, §987(f)(5)(D), and prospective-only application, reflects Congressional policy choices related to civil liability absent from the original MLA.  That weighs against finding an implied private right of action shorn of Congress's policy choices (and in spite of them).  The amendment strongly indicates that no private right of action existed prior to January 2, 2013.

---

[13] *See Williams v. U.S. Bank*, 2013 WL 571844 (C.D. Cal. 2013) (SCRA §521 does not contain private right of action, just criminal penalty for knowing violations); *U.S. Bank v. Gilliam*, 2012 WL 1067669 (N.D. Cal. 2012); *Hurley v. Deutsche Bank Trust Co.*, 2009 WL 701006 (W.D. Mich. 2009).

### d.  Plaintiffs cannot get past the *Sandoval* and *Love* test.

The default position is no private right of action.  Plaintiffs had the burden to show "affirmative evidence of Congressional intent" for an implied private right. *Sandoval*, 121 S.Ct. at 1523 n.8.  With all parts of the *Love* test pointing against it, the district court erred in finding a private right of action for damages implied by the MLA.

### 2.  If *TransAmerica* remains good law after *Sandoval*, the implied private right is a limited one for rescission and restitution.

The district court relied on *TransAmerica*, undoubtedly because the statute in that case also declared "void" contracts contrary to statutory requirements. (Order 10.)  But the Supreme Court decided *TransAmerica* decades before the analytical redirection announced in *Sandoval*, specifically the singular focus on Congressional intent and the primacy given to the statutory text and structure in the search for intent.  The vitality of *TransAmerica* after *Sandoval* is very much in doubt.  *Smith v. Oppenheimer Funds Distr., Inc.*, 824 F.Supp.2d 511, 517-521 (S.D.N.Y. 2011).  Some of the reasoning in *TransAmerica* (such as the notion that "settled rules of statutory construction yield, of course, to persuasive evidence of a contrary legislative intent," *TransAmerica*, 100 S.Ct. at 247) definitely did not survive *Sandoval*.[14]  *Sandoval*, 121 S.Ct. at 1520 & n.7.  While *TransAmerica*

---

[14]  Plaintiffs concede that the Supreme Court has changed the analysis since *TransAmerica*.  (Hr'g 16.)  *Sandoval* cited *TransAmerica* only for the proposition

focused on the word "void" when finding a *limited* implied private right of action, the *TransAmerica* Court did not consider whether that section contained rights- and remedy-creating language, the starting point of *Sandoval* analysis. From the word "void," *TransAmerica* took a logical step to recognizing a defense to contract enforcement, then lept to a cause of action for rescission and restitution (but not damages). That leap is too far removed from the text after *Sandoval*. *See Oppenheimer Funds*, 824 F.Supp.2d at 520 (after *Sandoval*, "similarity between different statutes is no substitute for the careful analysis of the proposed private right of action against the text and structure of the entire statute at issue"). Merely following the result in *TransAmerica* does not comport with the text-centric analysis required by *Sandoval* and *Love*.

Were the Court inclined to find an implied private right of action, the nature of relief available becomes the next logical question, since applicable jurisprudence—including *TransAmerica* itself—establishes that determining the relief available is an essential part of deciding whether a private right of action exists. The *TransAmerica* Court held that a statutory provision declaring contracts void "fairly implied a right to specific and limited relief in federal court." *TransAmerica*, 100 S.Ct. at 246. On that basis, the Court found "a limited private

---

that Congressional intent to create a private remedy matters more than factors identified in earlier cases. *Sandoval*, 121 S.Ct. at 1519-20. *Sandoval* refined *TransAmerica* by focusing the search for Congressional intent on statutory text.

remedy…to void an investment advisers contract [and for rescission and restitution], but…no other private causes of action, legal or equitable." *Id.* at 250. The limited private right of action for rescission and restitution would not, the Court cautioned, permit an end-run around the conclusion that Congress did not impliedly create a general cause of action for damages:

> Where rescission is awarded, the rescinding party may of course have restitution of the consideration given under the contract, *less any value conferred by the other party*. *See* 5 A. Corbin, CONTRACTS, §1114 (1964). Rescission would not, however, include compensation for any diminution in value of the rescinding party's investment alleged to have resulted from the adviser's action or inaction. Such relief could provide by indirection the equivalent of a private damages remedy that we have concluded Congress did not confer.

*Id.* at 246 (footnote omitted; emphasis added).[15]

If *TransAmerica* remains good law after *Sandoval*, it stands for the proposition that a particular statute declaring contracts void implied a private right of action for limited relief: rescission and restitution, not damages. In finding "a private right of action for damages" (Order 11-12), the district court reached a result directly contrary to *TransAmerica*. If the original MLA contained an implied private right of action under *TransAmerica*, Defendants were entitled to partial summary judgment holding that the relief available is limited to rescission

---

[15] *TransAmerica* did not address whether state or federal law would supply the rule of decision for rescission and restitution claims, though its citation to Corbin suggests state law would govern. If so, the law of rescission and restitution in 18 jurisdictions would splinter commonality and defeat predominance in this case.

and restitution, meaning Plaintiffs could recover from Defendants no more than "the consideration [they gave] under the contract, less any value conferred" by Defendants. *TransAmerica*, 100 S.Ct. at 249 n.14. Not the "damages" suggested by the district court or the "punitive" remedy Plaintiffs seek.

### B. The court's private-right-of-action ruling stopped short of deciding the crucial question: What, if any, common remedy is available?

The Order states that Plaintiffs have a private right of action. The Order leaves unclear whether class-wide litigation will determine just rights under the MLA or remedies as well.[16] By referring to both a "private right of action for damages" and "an unjust enrichment remedy" (Order 11, 12 n.4), the Order suggests both possibilities. Yet damages are barred under *TransAmerica*. And unjust-enrichment claims are particularly ill-suited to class treatment.

Knowing whether a common remedy exists affects the predominance analysis necessary under Rule 23(b)(3). The balance between class-wide and individualized issues will tip differently depending on whether just the right or both the right and the remedy present common issues. A single federal remedy in damages of some sort affects the predominance analysis differently than 18 state unjust-enrichment remedies with potentially varying elements, standards, defenses,

---

[16] The incomplete and imprecise ruling on this issue inextricably intertwined with class certification flows from the district court's failure to identify the class claims, issues, and defenses (Part III, *infra*).

and recoveries. By the same token, *TransAmerica*'s restitution remedy may well rely on varying state law to supply the rule of decision, which would alter the predominance balance. *See In re Aqua Dots Litig.*, 270 F.R.D. 377, 386 (N.D. Ill. 2010) ("unjust enrichment varies too much from state to state to be amenable to national or even multistate class treatment"); *Thompson v. Bayer Corp.*, 2009 WL 362982, *4, 7-8 (E.D. Ark. 2009) (state-by-state variations in unjust-enrichment law defeat predominance); *In re ConAgra Peanut Butter Litig.*, 251 F.R.D. 689, 697-98 (N.D. Ga. 2008) (variations in state unjust-enrichment law "prevent the Court from finding that common issues of law predominate"). Rigorous analysis of the Rule 23 requisites must consider how the available remedies affect the predominance and superiority analyses. *Comcast*, 133 S.Ct. at 1433. The district court should have determined whether a remedy exists, what it is, and whether it is amenable to class-wide resolution. By not deciding what remedy exists, the court made rigorous analysis of predominance and superiority impossible.

The remedies suggested by *TransAmerica* (restitution) and the district court (unjust enrichment, if not damages) are *not* amenable to class-wide proof even if a single rule of decision governed the remedy. "Rescission is a 'purely personal remedy'…incompatible with class action suits." *Gawry v. Countrywide Home Loans, Inc.*, 640 F.Supp.2d 942, 961-63 (N.D. Ohio 2009) (quoting *James v. Home Constr. Co.*, 621 F.2d 727, 731 (5th Cir. 1980)); *see also Andrews v. Chevy Chase*

*Bank*, 545 F.3d 570, 574 (7th Cir. 2008); *Schramm v. JPMorgan Chase Bank, N.A.*, 2011 WL 5034663, *12-14 (C.D. Cal. 2011). And, as this Court held, the necessary inquiry into individual equities attendant to each class member makes "unjust-enrichment claims inappropriate for class-action treatment." *Vega*, 564 F.3d at 1274; *Bearden v. Honeywell Int'l, Inc.*, 702 F.Supp.2d 932, 943 (M.D. Tenn. 2010) (unjust-enrichment claims "are almost *per se* inappropriate for class-wide resolution").

The district court erred by not deciding what remedy is available, whether that remedy is common across the class, and whether it is amenable to class-wide resolution. The conclusion required by *Sandoval* and *Love* is that no remedy exists, so, for lack of commonality, no class should have been certified. *Cf. Christ*, 547 F.3d at 1298 (class certification vacated because no private right of action existed for relief sought). Alternatively, under *TransAmerica*, the remedy is limited to rescission and restitution, not damages or unjust enrichment; since those remedies are unsuited to class treatment, *Vega*, 564 F.3d at 1274, no class should have been certified.

**III. The district court failed to identify common claims, issues, and defenses.**

Rule 23(c)(1)(B) requires a class-certification Order to "define the class and the class claims, issues, or defenses…." The Order defines the class but not the class claims, issues, or defenses. While this Court has not yet elaborated on this requirement, the habit of district courts "treat[ing] the parameters of the class itself much more clearly and deliberately than the class claims, issues, or defenses" has come under heavy scrutiny in other circuits. Rule 23(c) "requires more specific and more deliberate treatment of the class issues, claims, and defenses than the [regular practice] has usually reflected." *Wachtel v. Guardian Life Ins. Co.*, 453 F.3d 179, 184-86 (3d Cir. 2006) (criticizing orders often "devoid of any clear statement regarding the full scope and parameters of the claims, issues, or defenses to be treated on a class basis"); *see also Ross v. RBS Citizens, N.A.*, 667 F.3d 900, 904-05 (7th Cir. 2012); *In re Pharma. Indus. Avg. Wholesale Price Litig.*, 588 F.3d 24, 38-40 (1st Cir. 2009). The error is undeniable.

The failure to identify class-wide claims, issues, and defenses reflects the district court's unaccounted for (or opaque) treatment of the commonality requirement. Not defining what common issues will be adjudicated makes testing the predominance balance impossible. Not recognizing what individualized issues remain for trial means the parties have no idea what will be tried, much less how the district court will manage an unwieldy trial of unspecified class-wide claims,

issues, and defenses and a known set of highly individualized ones.  Reversible error in itself, the district court's failure to comply with Rule 23(c)(1)(B) is both a symptom and cause of deeper analytical failings needing correction.

**IV.   The district court's analysis of commonality and typicality was flawed.**

        **A.   *Finding commonality required all-but-resolving dissimilar merits issues across the various jurisdictions.***

The Order contains no explicit analysis of Rule 23(a)'s commonality requirement. The district court's sole comment on commonality is fused with an equally bare conclusion about predominance: "Questions of law and fact common to the class clearly predominate over individual issues." (Order 45.) Reaching that result after declining to exclude from the class transactions in various states, the court seemingly found nationwide commonality by all-but-overruling various defenses to applicability of the MLA. (Order 39-45.) Reviewing a similarly muddled class-certification order, this Court held that "Rule 23 demands significantly greater analytical rigor and precision." *Vega*, 564 F.3d at 1269-70. By going too deep into the merits on the paramount merits issue, applicability of the MLA, in order to create the appearance of commonality, the district court abused its discretion.

As in *Vega*, the court below "never actually identified a single specific common question of law or fact." *Id.* at 1269. Plaintiffs urged a broad question: "Whether the transactions violate the MLA." (R.115 at 21.) As Defendants explained, the different contract terms and regulatory schemes at issue mean that Plaintiffs' simplistic question actually presents common questions only within each of four groupings of states, not across them. (R.166 at 17-22.) As the Supreme

Court explained in *Dukes*, alleging that class members "all suffered a violation of the same provision of law" will not suffice because a law "can be violated in many different ways." *Dukes*, 131 S.Ct. at 2551. Commonality exists when class claims

> depend on a common contention…of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke. … What matters to class certification…is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

*Id.* (internal quotation omitted). Finding a common answer to whether a law was violated will not be possible, so commonality will not be satisfied, unless a uniform policy or practice affects all members of the class the same way. *D.L. v. District of Columbia*, 713 F.3d 120, 126-27 (D.C. Cir. 2013) (observing that *Dukes* "changed the landscape" of commonality analysis).

The Order fails to apply the *Dukes* commonality test. The need to identify class-wide common questions capable of class-wide resolution generating common answers, in particular regarding applicability of the MLA to various forms of transactions, precludes certification of a nationwide class.

The MLA criminalizes certain practices by "creditors" in connection with extending "consumer credit" to servicemembers and dependents. 10 U.S.C. §987(a), (e). Under MLA regulations, "Consumer credit means closed-end credit offered or extended to a covered borrower primarily for personal, family or

household purposes, as described in paragraph (b)(1) of this section." 32 C.F.R. §232.3(b). Paragraph (b)(1) identifies three specific kinds of transactions that qualify as "consumer credit": payday loans, vehicle-title loans, and tax-refund-anticipation loans. *Id.* The regulations further define vehicle-title loans governed by the MLA:

> Vehicle title loans. Closed-end credit with a term of 181 days or fewer that is secured by the title to a motor vehicle, that has been registered for use on public roads and owned by a covered borrower….

32 C.F.R. §232.3(b)(1)(ii). "Credit" is defined as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 32 C.F.R. §232.3(d). "Creditor" means "a person who is engaged in the business of extending consumer credit with respect to a consumer credit transaction covered by" the MLA regulations. 32 C.F.R. §232.3(e). Thus, the essential features of a vehicle-title loan that qualifies as "consumer credit" subject to the MLA are (1) a creditor, (2) a debtor, and (3) the right to defer payment of debt. "Debt" means "liability on a claim; a specific sum of money due by agreement or otherwise." BLACK'S LAW DICTIONARY (9th Ed. 2009). Nothing in the MLA statute or implementing regulations expressly refers to title pawns or deems pawn transactions "consumer credit" governed by the MLA.

1.  <u>The MLA does not apply to pawns, pledges, or Texas services.</u>

Defendants do business in eighteen jurisdictions at issue in this case. The contracts in each vary in conformity with the governing regulatory regime for title-related transactions. The varying contract terms and applicable laws fit into four groups. Real and fundamental differences among the groups go directly to whether the MLA governs the transaction.

<u>Pawn Jurisdictions.</u>    Alabama, Georgia, and Puerto Rico permit title pawn transactions consistent with their respective pawnshop statutes. The pawn agreements used in Alabama and Georgia, including those with the Named Plaintiffs, all state in the first paragraph, "This is a pawn transaction." (R.166-1 ¶7 & 7-20; 201 at 15.) The pawn agreements contain no promise to pay on the part of the customer. (*Id*.) They refer to the Pawnbroker (not lender), Pledgor (not borrower), Property Pledged, and Pawnbroker's lien. (*Id*.) Pawn customers undertake no obligation to redeem the pawned goods, repay the funds advanced, or pay any pawnshop charges. (*Id*.) By law too, pawn transactions do not involve any personal liability on the customers' part or obligation to redeem the pawned goods, repay the amount advanced, or pay any pawnshop charges. Ala. Code §5-19A-6 & 8(7); O.C.G.A. §44-12-137(a)(7); P.R. Pub. L. 23 (2011). Statutes in each Pawn Jurisdiction specifically forbid any agreement creating personal liability for the pawn customer. *Id*.

With neither an obligation to pay nor any exposure for personal liability on the customer's part, pawn transactions do not involve debt. Pawnbrokers are not creditors. Their customers are not debtors. The customer simply has a right to redeem pledged goods that the pawnbroker must retain for a period of time. Ala. Code §§5-19A-8(8), -9, -10(b); O.C.G.A. §44-12-137(a)(8); P.R. Pub. L. 23, Art. 17(a)(15), 18(a)(7)-(9). Should the customer not exercise that option, title to the goods passes by operation of law to the pawnbroker. Ala. Code §5-19A-6; O.C.G.A. §44-14-403(b)(3); P.R. Pub. L. 23, Art. 14. Non-payment of the redemption amount is merely the non-exercise of a right. Although consequences flow from the customer's choice to not redeem the pledged goods by paying the specified amount, the consequences do not create an obligation to pay or mean that pawn transactions involve debt. Because pawn transactions do not involve debt, they do not qualify as "consumer credit" regulated by the MLA. 32 C.F.R. §232.3(b)(1)(ii) & (d).

Title Pledge States. Tennessee and Mississippi have "title pledge" regimes. Tenn. Code Ann. §45-15-103; Miss. Code Ann. §75-67-403. Title pledge contracts in those states contain no promise to pay. (R.166-1 ¶8 & 21-28) Tennessee law makes title pledges non-recourse against the pledgor. Tenn. Code Ann. §45-15-115. Mississippi law provides that the "pledgor shall have no obligation to redeem pledged property or make any payment on a title pledge

transaction." Miss. Code. Ann. §75-67-411. Those characteristics take the title pledge business outside the MLA's ambit, since the transactions involve no debt and so do not qualify as "consumer credit" within the meaning of the MLA.

Texas. Texas has a unique regulatory regime permitting lenders to receive no more than 10% interest, while a "credit access business" or "credit services organization" that facilitates the loan may collect its own charges for services rendered. Tex. Fin. Code Ann. §§393.001, .221 & .602; *see generally Lovick v. RiteMoney Ltd.*, 378 F.3d 433 (5th Cir. 2004). Defendant Texas Car Title and Payday Loan Services, Inc. ("TCT"), acts as a credit access business, not a lender. (R.166-1 ¶9 & 29-33; R.201 at 19.) Under the agreements used in Texas, the lender to which the borrower made a promise to pay was not TCT but a third-party to whom TCT provided services pursuant to Texas law. (R.201 at 19-20.) Since TCT is not a creditor to whom customers owe a debt (R.201 at 20), the MLA does not apply to TCT.

Loan States. In contrast to the pawn, pledge, and Texas business, contracts used in title-loan states contain two hallmarks of loan agreements involving debt. One such provision is a promise to pay. (R.166-1 ¶10 & 34-83; 201 at 16.) The other gives the lender the right to accelerate the debt and proceed to collect from the customer personally. (R.201 at 17.) Such loans readily fit within the MLA

definition of consumer credit because they involve debt—an obligation to pay. The no-credit defense does not apply in loan states.

### 2. The district court's different rulings on applicability of the MLA show the lack of commonality and typicality.

Two separate passages of the Order addressed applicability of the MLA. (Order 12-20, 39-45.) The district court "rejected" arguments that Defendants are not creditors who extend consumer credit within the meaning of the MLA, though the court did not grant summary judgment to either side and found triable issues of fact in Texas. While not done under the auspices of a commonality analysis, the district court's "reject[ion]" of three different not-covered-by-the-MLA defenses seems designed to achieve commonality for a nationwide class, as each ruling declined to exclude from the class customers from the various states. The court's analysis was wrong on the merits. But, for class-certification purposes, what matters is that the court went too far into the merits in order to create commonality.

Pawn Jurisdictions. The district court relied on three points to deem pawns covered by the MLA. First, the MLA regulations, the court concluded, incorporated a Federal Reserve Board Official Staff Interpretation deeming pawns "closed-end credit" for purposes of TILA. Second, pawn agreements refer to "credit" in the mandatory TILA disclosures. Above all, "the Named Plaintiffs deposited a vehicle title with a Defendant as security for payment of a debt. If a specific sum of money is not paid, then the Plaintiff loses title to the car, as well as

the car itself." (Order 20.) The court simply misread the cross-references to TILA in the MLA regulations, which adopted the TILA definition of open-end credit, 32 C.F.R. §232.3(a), not closed-end credit and not the related Staff Interpretation concerning pawns. Nothing in the TILA box or the possibility of losing the car creates a debt. The court's conclusion that "Plaintiffs deposited a vehicle title with a Defendant as security for a debt" finds no support in the text of the MLA or its implementing regulations, for *there is no debt.*

Pledge States. To rule pledges covered by the MLA, the district court relied on contract language granting a security interest, referring to the transaction as a loan, and (in Tennessee only) stating that a customer will have to pay more if he renews "rather than pay the debt in full when due." Those points, and the possibility of losing the car, led the court to conclude that pledges involve consumer credit within the meaning of the MLA. (Order 41-42.) Yet nothing in those transactions creates a debt or involves the extension of credit, and the state statutory schemes prohibit personal liability.

Texas. The district court found that, even though TCT is not the lender, "a reasonable factfinder could conclude that [TCT] arranges the loan, cuts the loan check, collects the loan payments, and receives a credit service charge." (Order 44-45.) On that basis, the court declined to exclude Texas customers from the class, but stopped short of holding that TCT is a creditor that extends credit under

the MLA, and allowed "the possibility that a subclass may be appropriate for these Texas claims." (Order 45 n.11.)

In certifying a single nationwide class, the district court may have accepted the broad question Plaintiffs posed.[17] It is precisely the kind disfavored by *Dukes*. The answers depend on the resolution of several underlying issues lacking commonality among all class members because interpretation of different form contracts and consideration of different applicable state laws may generate different conclusions. Resolving whether the MLA applies to pawns does not answer whether a credit access business facilitating loans in Texas (but not acting as lender) is a creditor. Determining whether a loan in the loan states violated the MLA does not answer whether pledge transactions with no promise to pay and no personal liability involve credit and debt. The starkly different analysis conducted by the district court in each group of states shows the undeniable lack of commonality and typicality. Breaking Plaintiffs' overly broad question down into component questions "capable of class-wide resolution" generating a "common answer" precludes certification of a single nationwide class; subclasses are required to account for material variations between the four groups. *Sacred Heart*, 601 F.3d at 1175-80 (reversing certification for failure to sufficiently consider

---

[17] R.115 at 21 ("However, the question raised in this case is simple – Do Defendants' practices of making loans to Servicemembers and their dependents violate the MLA?").

commonality problems and possible subclassing based on variations in contracts and affirmative defenses).

The only route to nationwide commonality and typicality, such that claims of all class members rise or fall together, would require first deciding the pawn, pledge, and Texas issues against Defendants on the merits.  By delving so far into the merits that it "rejected" major defenses, the district court created commonality by ignoring the teachings of *Dukes* about class-wide capacity to generate common answers, and *Amgen, Inc. v. Connecticut Retirement Plans & Trust Funds*, 133 S.Ct. 1184, 1195 (2013), about considering the merits "to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  In this way, the "district court abused its discretion by following improper procedures in making its determinations, to the extent it made them at all, with respect to commonality…."  *Vega*, 564 F.3d at 1269-70.

## B.   *Plaintiffs' claims are typical only in the Pawn Jurisdictions; there are no class representatives elsewhere.*

The district court's half-sentence conclusory finding of typicality (Order 45) was error.  State-by-state variations in material facts and applicable law make the Named Plaintiffs' claims not typical of claims of class members in other states. *See Christ*, 547 F.3d at 1298 n.12.  As customers of pawnshops in Alabama and Georgia, the Named Plaintiffs' claims cannot be typical of customers' claims in the

pledge states, loan states, or Texas. If the Named Plaintiffs ultimately lose because pawns do not involve credit, for example, that will not necessarily determine the result in the pledge states, and it's certainly not dispositive of claims in loan states. Winner or loser, Plaintiffs' argument for treating pawns as "consumer credit" looks nothing like the argument a Texas customer would have to make to treat a credit access business as a creditor—a conclusion recognized by the district court when noting that a subclass may be necessary for Texas. (Order 45 n.11.)

Like lack of commonality, atypicality stands as another reason to sub-class by groups of states. Once properly sub-classed, however, the only sub-class potentially suitable for certification is the one covering the Pawn Jurisdictions, because the sub-classes for the pledge states, loan states, and Texas all lack a class representative. *See Johnson v. American Credit Co.*, 581 F.2d 526, 532 (5th Cir. 1978) (subclass must independently meet all Rule 23 requirements and representative plaintiff must be member of class he seeks to represent). Therefore, the district court erred in certifying a class including customers outside the Pawn Jurisdictions.

(To the extent it was proper to reach the issue, the district court erred in "reject[ing]" the pawn defense, for the reasons explained above.)

**V. The district court failed to conduct a rigorous analysis of predominance.**

The district court's failure to identify common claims, issues, and defenses makes it impossible to tell what, if any, common matters may predominate over myriad individualized issues. If a rigorous predominance analysis was done for the certified class, it appears nowhere in the Order. The Order contains a bare conclusion on predominance paired with commonality: "Questions of law and fact common to the class clearly predominate over individual issues." (Order 45.)

The sole predominance analysis appearing in the Order pertained to Plaintiffs' effort to include in the class customers who signed a CBIS indicating no military affiliation. (Order 37-39.) The court concluded that the knowledge element of the MLA would cause individualized issues to overwhelm common issues if a class included customers who provided conflicting information as to military status, particularly a signed negative CBIS. (*Id.*) Conducting a rigorous predominance analysis on that point only, the district court reached the correct conclusion. On all the other predominance problems identified by Defendants (R.199 at 11-14), the Order betrays no analysis. That infirmity has an obvious source: Plaintiffs did not offer any explanation of how common issues predominate over the individual issues identified by Defendants. (R.191 at 16-18.) When the proper rigorous analysis is done, individual issues predominate over any common ones—by far. "[E]ntirely neglect[ing] to consider the critical issue of

predominance" for the class that was certified "constitute[s] an obvious abuse of discretion and clear reversible error." *Vega*, 563 F.3d at 1269.

"The predominance inquiry is far more demanding than Rule 23(a)'s commonality requirement." *Vega*, 564 F.3d at 1270. It "requires an examination of 'the claims, defenses, relevant facts, and applicable substantive law'…to assess the degree to which resolution of the class-wide issues will further each individual class member's claims against the defendant." *Babineau v. Federal Exp. Corp.*, 576 F.3d 1183, 1191 (11th Cir. 2009). Common issues of fact and law predominate if they "'have a direct impact on every class member's effort to establish liability' that is more substantial than the impact of individualized issues in resolving the claim or claims of each class member." *Vega*, 564 F.3d at 1270 (quoting *Klay v. Humana, Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004)). This Court put the predominance test in simple terms:

> If the addition of more plaintiffs to a class requires the presentation of significant amounts of new evidence, that strongly suggests that individual issues (made relevant through the inclusion of these new class members) are important. If, on the other hand, the addition of more plaintiffs leaves the quantum of evidence introduced by the plaintiffs as a whole undisturbed, then common issues are likely to predominate.

*Klay v. Humana*, 382 F.3d at 1255. "[I]f the defendant has non-frivolous defenses to liability that are unique to individual class members, any common questions may well be submerged by individual ones." *Sacred Heart*, 601 F.3d at 1170.

Here, the individualized elements of Plaintiffs' MLA claim and the individualized aspects of multiple defenses predominate over any conceivable common issues.

To establish an MLA violation, the district court correctly held, Plaintiffs must prove Defendants' knowledge of each class member's covered-borrower status. (Order 38.) The knowledge element means each class member will have to prove that Defendants knew he or she was on active duty or a military dependent. *See Liporatav v. United States*, 105 S.Ct. 2084 (1985) (statute that prohibited knowingly using food stamps in unauthorized manner required proof the defendant knew conduct was unauthorized by statute or regulation). This knowledge element alone defeats any possibility of establishing predominance because each class member must prove a fact unique to himself or herself in order to prevail.

To recover a payment voluntarily made when no enforceable legal obligation required it, a plaintiff must prove an "immediate and urgent necessity for payment." *Air España v. Brien*, 165 F.3d 148, 153 (2nd Cir. 1999). Whether each class member had an "immediate and urgent necessity" turns on individualized fact issues. Consequently, the voluntary-payment-doctrine defense defeats predominance and thus class certification. *Premier Health Center, P.C. v. United Health Group*, 292 F.R.D. 204, 225-27 (D.N.J. 2013); *Gawry*, 640 F.Supp.2d at 961-63.

BLACK'S defines the *in pari delicto* doctrine as "the principle that a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing." Unclean hands is "the principle that a party cannot seek equitable relief or assert an equitable defense if that party has violated an equitable principle, such as good faith."[18] BLACK'S LAW DICTIONARY (9th ed. 2009). A customer with knowledge of the MLA who went forward with a title loan, pledge, or pawn could certainly be found to have participated in wrongdoing or to have acted in bad faith.[19] Because those determinations must be made on a customer-by-customer basis, each additional plaintiff adds to the quantum of evidence. *Sacred Heart*, 601 F.3d at 1178 (individual issues predominate where defendant offers individualized evidence of what class members knew of allegedly illegal conduct about which they complain); *Vega*, 564 F.3d at 1274 ("inquiries into individualized equities attendant to each class member" defeats commonality and predominance). And, of course, damages are individualized for every class member. (Order 31-32 (denying certification under Rule 23(b)(2) because the damages sought are individualized).)

---

[18] Defendants cite the BLACK'S definitions for ease of discussion. The contours of these defenses naturally vary from state to state. So, in addition to requiring individualized proof, the legal standard varies within the class.

[19] For example, Plaintiff Castillo testified he knew about the MLA and was responsible for instructing subordinates about it. (R.169 at 36-37, 55-56.)

So with every customer added to the class, the quantum of proof necessary to take this case to judgment rises in a linear progression, defeating predominance. *Vega*, 564 F.3d at 1274. The tandem failure of Plaintiffs and the district court to identify common claims, issues, or defenses, and analyze whether they predominate over all of these individualized issues falls well short of carrying Plaintiffs' burden and conducting the rigorous analysis required for class certification. Given the relative ease of proving whether contract terms comply with the MLA's requirements and the straightforward legal issue of whether the MLA applies to certain transactions, the conceivable class-wide issues do not come close to predominating over the individualized issues. *Klay*, 382 F.3d at 1254 (certification improper where, after resolution of classwide issues, "plaintiffs must still introduce a great deal of individualized proof"); *Babineau*, 576 F.3d at 1191-95 (individualized defenses bar class certification). The district court's failure to weigh the common issues (whatever they may be) against the myriad unresolved individualized issues and explain how the balance tips, an essential part of the rigorous analysis for certification, constitutes a manifest abuse of discretion. *Cf. Ealy v. Pinkerton Gov't Servs, Inc.*, 514 F. App'x 299, 306 (4th Cir. 2013).

## VI.    The district court failed to conduct a rigorous analysis of superiority and manageability.

The Order did not address any of the four non-exclusive superiority factors listed in Rule 23(b)(3), most notably manageability.    On superiority and manageability, the Order states a bare conclusion in summary fashion, without any discussion of the serious manageability problems present.[20]   (Order 45.)   Such a "conclusory statement, which cannot truly be called analysis, is grossly insufficient and easily rises to the level of an abuse of discretion."   *Vega*, 564 F.3d at 1278.   Any meaningful consideration of superiority and manageability exposes this case as unsuited to certification under (b)(3).

"Of all the superiority factors listed in Rule 23, manageability has been the most hotly contested and the most frequent ground for holding that a class action is not superior."   *Buford v. H&R Block, Inc.*, 168 F.R.D. 340, 363 (S.D. Ga. 1996). "Issues of class action manageability encompass the whole range of practical problems that may render the class action format inappropriate for a particular suit."   *Andrews v. AT&T Co.*, 95 F.3d 1014, 1023 (11th Cir. 1996) (internal

---

[20] Because discovery closed and dispositive motions were filed *before* Plaintiffs asserted Rule 23(b)(3), Defendants had no occasion to develop evidence on the Rule 23(b)(3)(A)-(D) factors in discovery.  Defendants specifically stated a need to conduct discovery on matters relevant to certification under (b)(3).  (Dkt.198 at 6-8; 199 at 14 n.7.)   The district court plainly erred in remarking that "no one contends that additional discovery is necessary to support or oppose class certification under Rule 23(b)(3)." (Order 32.)

quotation omitted).  Since a plaintiff seeking class certification "bears the burden of establishing each element of Rule 23…, the courts must consider how a case will be tried as part of the superiority assessment….  [This Court] therefore recommend[s] that district courts make it a usual practice to direct plaintiffs to present feasible trial plans…as early as practicable when seeking class certification."  *Vega*, 564 F.3d at 1279 n.20.

Plaintiffs gave the district court no plan for making trial of this case manageable.  Numerous elements of claims and defenses require proof specific to each class member, including:

- Defendants' knowledge of each customers' covered-borrower status;

- whether each non-active-duty class member qualifies as a military dependent and on what grounds;

- whether customers paid voluntarily or acted on "immediate and urgent necessity";

- whether customers knew of the MLA's restrictions and proceeded with forbidden transactions anyway (acting *in pari delicto*);

- whether customers have unclean hands barring equitable remedies;

- the balance of equities for each transaction and other issues relevant to unjust-enrichment claims;

- whether each customer seeking rescission can and did tender back the benefits of the transaction; and

- the amount of recoverable individualized damages.

Resolving those issues will necessarily involve "the presentation of a substantial amount of evidence specific to each of an unknown number of class members. This reality poses serious challenges to the efficiency and manageability of the class action proceeding." *Vega*, 564 F.3d at 1278; *see also Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1192 (9th Cir. 2001) (superiority not established where "each class member has to litigate numerous and substantial separate issues"). Plaintiffs' failure to address, much less establish, manageability prevented the court from satisfying its obligation to "consider 'how a trial of the alleged causes of action would be tried.'" *Vega*, 564 F.3d at 1279. As a result, Defendants are facing trial with no manageable trial plan or, indeed, any definitive statement of what class-wide claims, issues, and defenses will be tried. Courts have roundly rejected as an abuse of discretion this kind of "figure-it-out-as-we-go-along" approach. *Robinson v. Texas Auto Dealers Ass'n*, 387 F.3d 416, 426 (5th Cir. 2004).[21]

---

[21] In the event of remand for further class-certification analysis, the district court should require Plaintiffs to present a specific trial plan, including proposed jury instructions, for a manageable trial on the merits. *Vega*, 564 F.3d at 1279 n.20.

A touchstone of superiority (and the only argument Plaintiffs offered) is that a single class action will better resolve all class members' claims than numerous separate actions. *Sacred Heart*, 601 F.3d at 1183-84. But in this case, Plaintiffs succumbed to the "perverse incentive," *Dukes*, 131 S.Ct. at 2591, to jettison damage claims in an effort to certify a mandatory class under Rule 23(b)(2). (R.115 at 26.) When changing to (b)(3), Plaintiffs stood by their decision to assert less than all damage claims class members may have. Plaintiffs expect individual class members to pursue their own separate cases after this one, to recover the rest, the full panoply, of their damages. (R.175 at 13.) To justify their unabashed claims-splitting, Plaintiffs repeatedly admitted, even in the Third Amended Complaint, that class members can "individually and economically prosecute and pursue their individual damage claims and available remedies…in other jurisdictions…." (R.18 ¶157; 76 ¶184; 190-1 ¶185; 205 ¶185.) Because this case will not resolve all class members' claims, and individuals will still need to sue separately to obtain complete relief, Plaintiffs cannot meet their burden of establishing superiority. Certifying this case will not eliminate the need for separate, individual adjudications. In these circumstances, superiority cannot be shown, making certification under (b)(3) an abuse of discretion.

## VII. The district court committed clear error in finding a class including military dependents ascertainable.

Plaintiffs initially moved to certify a class comprised of two subclasses, one for active-duty servicemembers and one for military dependents. As Plaintiffs explained at the class-certification hearing, even though the MLA treats servicemembers and dependents the same,[22] "it's going to be harder to identify who the dependents are…so that's why we broke them up" into separate subclasses. (Hr'g 51-53.) Thus, ascertainability of class members presents a known and acute problem when it comes to dependents.

Certifying a single class covering both active-duty servicemembers and dependents, the district court stated, "the class is ascertainable because the parties have determined a way to identify covered borrowers who entered a vehicle title loan transaction during the relevant timeframe." (Order 45.) That single sentence contained the entirety of the court's ascertainability analysis. It was clear error.

"Before a district court may grant a motion for class certification, a plaintiff…must establish that the proposed class is adequately defined and clearly ascertainable." *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012)

---

[22] Applying to active-duty servicemembers and military dependents alike, the MLA defines (1) "covered member" as a member of the armed forces on active duty, and (2) "dependent" as a covered member's spouse or child or "an individual for whom [a covered] member provided more than one-half of the individual's support for 180 days immediately preceding an extension of consumer credit covered by this section." 10 U.S.C. §987(i)(1) & (2).

(internal quotations omitted); *Grimes v. Rave Motion Pictures Birmingham, LLC*, 264 F.R.D. 659, 663-64 (N.D. Ala. 2010). "If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Marcus v. BMW of North Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012) ("[W]here nothing in company databases shows or could show whether individuals should be included in the proposed class, the class definition fails."); *Stalley v. ADS Alliance Data Systems, Inc.*, 2013 WL 6184065, *11 (N.D. Fla. 2013) (class should not be certified if court must engage in individualized determinations of class membership); *Fisher v. CIBA Specialty Chemicals Corp.*, 238 F.R.D. 273, 301 (S.D. Ala. 2006). "The ascertainability requirement serves several important objectives," including eliminating administrative burdens incongruous with class actions, protecting absent class members by facilitating practicable notice, and protecting defendants by making those bound by a class judgment identifiable. *Marcus*, 687 F.3d at 593.

As to dependents, the district court's ascertainability finding is clearly erroneous. The court was mistaken in believing the parties had "determined a way to identify" dependents. Though acknowledging the problem, Plaintiffs did not show how to identify dependents. The only evidence on ascertainability of dependents proves that, apart from signed CBIS's denying dependent status, Defendants' customer database and transaction files do not track or collect

evidence of dependent status, so cannot provide objective evidence of class membership. (R.189-1 ¶3.)

The parties' efforts to identify *potential* dependents through imperfect computer searches and a laborious manual file review (R.127, 131, 134) yielded thousands of false positive hits (in Defendants' view) or inconclusive results (in Plaintiffs' view). That process revealed just 31 customers whose files contained information indicative—but not determinative—of dependent status and no CBIS denying dependent status. (R.189-1 ¶4.) However reliable the computer searches and file review are as a starting point, the only way to go from *potential* to *actual* dependents is to hold mini-trials on the threshold individualized issue of class membership. Even then, since Defendants' databases do not track military or dependent status, the parties have no way of gauging the accuracy of the imperfect computer searches and no way of knowing whether any dependents were not captured by the fundamentally imperfect searches. No one has even suggested a way of identifying dependents not captured by those searches. Dependents thus comprise the quintessentially unascertainable class.

The inability to identify dependents through a review of Defendants' records, and the need to conduct hundreds or thousands of mini-trials to determine whether *potential* dependents "hit" by imperfect searches are indeed in the class, prevented Plaintiffs from establishing "by a preponderance of the evidence that the

class is ascertainable." *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 354-55 (3d Cir. 2013). Certifying an unascertainable class that includes dependents was clearly erroneous as a factual matter and a manifest abuse of discretion.

## **RELIEF REQUESTED**

Defendants/Appellants request that this Court vacate the Order and remand with instructions that no class be certified in this case.

This 18th day of August, 2014.

Respectfully submitted,

SMITH, GAMBRELL & RUSSELL, LLP

/s/ *David C. Newman*
Stephen M. Forte
Georgia Bar No. 270035
Edward H. Wasmuth, Jr.
Georgia Bar No. 739636
David C. Newman
Georgia Bar No. 541148
Colin R.P. Delaney
Georgia Bar No. 216858

1230 Peachtree Street, N.E.
Promenade, Suite 3100
Atlanta, Georgia  30309-3592
Telephone: 404-815-3500
Facsimile:  404-815-3509

sforte@sgrlaw.com
ewasmuth@sgrlaw.com
dnewman@sgrlaw.com
cdelaney@sgrlaw.com

*Attorneys for Defendants/Appellants*

## CERTIFICATE OF COMPLIANCE WITH LENGTH LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This Brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because this Brief contains 13,999 words, excluding the parts of the Brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

2.      This Brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this Brief has been prepared in a proportionally spaced typeface using Microsoft Word/Microsoft Office Professional 2010 in 14-point Times New Roman.

3.      Per FED. R. APP. P. 32(4), this Brief has been printed on 8½ by 11-inch paper, and all text is double-spaced except for quotations more than two lines long, headings, and footnotes.

This 18th day of August, 2014.

*/s/ Colin R.P. Delaney* _____
Colin R.P. Delaney
Georgia Bar No. 216858

*Attorney for Defendants/Appellants*

## <u>CERTIFICATE OF SERVICE</u>

THE UNDERSIGNED counsel for Defendants/Appellants hereby certifies that this day he caused the foregoing **BRIEF OF APPELLANTS COMMUNITY LOANS OF AMERICA, *et al*.** to be served on all parties by means of the Court's ECF system on all registered participants and by depositing a service copy of same in the United States Mail with sufficient postage paid to ensure First Class delivery to the following counsel of record:

Roy E. Barnes, Esq.
John R. Bevis, Esq.
J. Cameron Tribble, Esq.
Barnes Law Group, LLC
31 Atlanta Street
Marietta, Georgia 30060
roy@barneslawgroup.com
bevis@barneslawgroup.com
ctribble@barneslawgroup.com

Kyle S. Fischer, Esq.
Fischer | Scott, LLC
233 12th Street, Suite 200
Columbus, Georgia 31901
kyle.fischer@fischerscott.com

The undersigned counsel further certifies that this day he caused the foregoing **BRIEF OF APPELLANTS COMMUNITY LOANS OF AMERICA, *et al*.** to filed with the Clerk of Court using the ECF system, with seven paper copies contemporaneously dispatched via FedEx for next-day delivery and filing with the Clerk at the below address:

John Ley, Clerk of Court
U.S. Court of Appeals for the Eleventh Circuit
56 Forsyth St., N.W.
Atlanta, Georgia  30303

This 18th day of August, 2014.

/s/ *Colin R.P. Delaney*
Colin R.P. Delaney
Georgia Bar No. 216858

Smith, Gambrell & Russell, LLP
Promenade, Suite 3100
1230 Peachtree Street, NE
Atlanta, Georgia 30309-3592
Telephone:  404-815-3500
Facsimile:  404-815-3509
Email: cdelaney@sgrlaw.com