# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

JASON M. COX, ESTEVAN CASTILLO,
LEO THOMAS TOOKES, JR., and ALESIA LEWIS-VINSON,

Plaintiffs/Appellees,

v.

COMMUNITY LOANS OF AMERICA, INC., et al.,

Defendants/Appellants.

Rule 23(f) Appeal from a Class-Certification Order
of the United States District Court for the Middle District of Georgia

**REPLY BRIEF OF APPELLANTS COMMUNITY LOANS OF AMERICA, *et al*.**

Stephen M. Forte
Edward H. Wasmuth, Jr.
David C. Newman
Colin R.P. Delaney

SMITH, GAMBRELL & RUSSELL, LLP
Promenade, Suite 3100
1230 Peachtree Street, N.E.
Atlanta, Georgia 30309-3592
Telephone: 404-815-3500
Facsimile: 404-815-3509

*Attorneys for Defendants/Appellants*

*Defendants/Appellants:*

Community Loans of America, Inc.
Alabama Title Loans, Inc.
Georgia Auto Pawn, Inc.
PR Auto Loans, LLC
Mississippi Title Loans, Inc.
Tennessee Title Loans, Inc.
Texas Title and Payday Loans, LLC
Texas Car Title and Payday Loan Services, Inc.
Fast Auto Loans, Inc.
Delaware Title Loans, Inc.
Idaho Title Loans, Inc.
Illinois Title Loans, Inc.
Fast Auto and Payday Loans, Inc. d/b/a Cash Cow
Southern Fast Loans of Louisiana, Inc. d/b/a Cash Cow
Missouri Title Loans, Inc.
New England Auto Finance, Inc.
New England Auto and Pay Loans, Inc.
New Mexico Title Loans, Inc.
Nevada Title and Payday Loans, Inc.
Dakota Auto Title Loans, Inc.
Utah Title Loans, Inc.
Wisconsin Auto Title Loans, Inc.
Robert I. Reich
Terry Fields

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

TABLE OF RECORD REFERENCES IN THE BRIEF ........................................ vi

PRELIMINARY STATEMENT ............................................................. 1

ARGUMENT ................................................................................. 6

I.   Plaintiffs did not show good cause for their late strategic change
     from Rule 23(b)(2) to (b)(3). ...................................................... 6

II.  No common claim exists, because the MLA does not contain an
     implied private right of action. ................................................. 9

     A.   The MLA contains no express private right of action. ..................... 9

     B.   The court erred in finding an implied private right of action. .......... 11

          1. The MLA fails the *Sandoval* and *Love* test. ........................ 11

             a.  The text contains no rights- or remedy-creating language. . ... 11

             b.  The MLA has a strong public enforcement mechanism. ........ 11

             c.  Statutory context points away from implied rights of action. . 12

          2. If *TransAmerica* remains good law after *Sandoval*, the implied
             private right is a limited one for rescission and restitution. ......... 13

     C.   The court's private-right-of-action ruling stopped short of deciding
          what, if any, common remedy is available? ..................................... 13

III. The district court failed to identify common claims, issues, and defenses.  16

IV.  The district court's analysis of commonality and typicality was flawed.  ... 18

     A.   The district court's different rulings on applicability of the MLA
          show the lack of commonality and typicality.  ................................ 18

     B.   The MLA does not apply to pawns, pledges or Texas services. ....... 21

V.    The district court failed to conduct a rigorous analysis of predominance.  . 25

VI.   The district court failed to conduct a rigorous analysis of superiority
      and manageability. ....................................................................................... 31

VII.  The district court committed clear error in finding a class including
      military dependents ascertainable. ................................................................. 33

RELIEF REQUESTED ............................................................................................... 37

# TABLE OF AUTHORITIES

**Cases**

*Air España v. Brien*,
    165 F.3d 148 (2nd Cir. 1999) .......................................................................28

*Alexander v. Sandoval*,
    121 S.Ct. 1511 (2001) ...........................................................*passim*

*Altria Group, Inc. v. Good*,
    129 S.Ct. 539 (2008)...................................................................................20

*American Pipe & Constr. Co. v. Utah*,
    94 S.Ct. 756 (1974) .....................................................................................7

*Amgen, Inc. v. Connecticut Retirement Plans & Trust Funds*,
    133 S.Ct 1184 (2013) ..................................................................................19

*Briggs v. Countrywide Funding Corp.*,
    949 F. Supp. 812 (M.D. Ala. 1996)..............................................................20

*Christ v. Beneficial Corp.*,
    547 F.3d 1291 (11th Cir. 2008) ...................................................................15

*EQT Prod. Co. v. Adair*,
    2014 WL 4070457 (4th Cir. 2014)..............................................................29

*Gebser v. Lago Vista Indep. Sch. Dist.*,
    118 S.Ct. 1989 (1998)..............................................................................13-14

*General Tel. Co. v. Falcon*,
    102 S.Ct. 2364 (1982) ..................................................................................1

*Girard v. Aztec RV Resort, Inc.*,
    2011 WL 7962612 (S.D. Fla. 2011)..............................................................6

*In re ConAgra Peanut Butter Litig.*,
    251 F.R.D. 689 (N.D. Ga. 2008) ...........................................................29 n.6

*In re Mexcio City Aircrash of October 31, 1979*,
708 F.2d 400 (9th Cir. 1983) ........................................................10

*Liese v. Indian River Cnty Hosp. Dist.*,
701 F.3d 334 (11th Cir. 2012)......................................................14

*Linscott v. Vector*,
2006 WL 240529 (D. Or. 2006)..............................................10 n.2

*Little v. T-Mobile USA, Inc.*,
691 F.3d 1302 (11th Cir. 2012) ...............................................35-36

*Love v. Delta Air Lines, Inc.*,
310 F.3d 1347 (11th Cir. 2002) ..............................................*passim*

*Marcus v. BMW of North America, LLC*,
687 F.3d 583 (3d Cir. 2012) .........................................................35

*Mason v. George*,
2014 WL 583004 (M.D. Ga. 2014)..................................................6

*Robinson v. Texas Auto Dealers Ass'n*,
387 F.3d 416 (5th Cir. 2004) ........................................................31

*Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*,
601 F.3d 1159 (11th Cir. 2010) ........................................28, 29 n.6

*Shahriar v. Smith & Wollensky Rest. Group, Inc.*,
659 F.3d 234 (2d Cir. 2011).........................................16, 25-26, 26

*Smith v. West Facilities Corp.*,
2006 WL 898134 (S.D. Ala. 2006)...................................................6

*Sosa v. Airprint Sys., Inc.*,
133 F.3d 1417 (11th Cir. 1998)...................................................6, 7

*TransAmerica Mortgage Advisors, Inc. v. Lewis*,
100 S.Ct. 242 (1979) ...............................................................*passim*

iv

*United States v. $33,330.00 in U.S. Currency*,
    901 F. Supp. 2d 1354 (N.D. Ga. 2012)...........................................................6

*United States v. Jordan*
    915 F.2d 622 (11th Cir. 1990) ...................................................................12

*Vega v. T-Mobile USA, Inc.*,
    563 F.3d 1256 (11th Cir. 2009) ..........................................................*passim*

*Wachtel v. Guardian Life Ins. Co.*,
    453 F.3d 179 (3d Cir. 2006) .......................................................................39

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S.Ct. 2541 (2011) ..........................................................................7, 18

## Statutes

10 U.S.C. §987...............................................................................*passim*

10 U.S.C. §987(d).................................................................................20

10 U.S.C. §987(f)(2) .............................................................................10

## Rules

FED. R. CIV. P. 16 ..................................................................................6

FED. R. CIV. P. 23 ...........................................................................*passim*

## Regulations

12 C.F.R. Pt. 226, Supp. I, Subpt. C........................................................22

32 C.F.R. §232 ...............................................................21, 22, 23, 34

72 Fed. Reg. 50,590............................................................................11, 12

79 Fed. Reg. 58,601.............................................................................23

# TABLE OF RECORD REFERENCES IN THE BRIEF

| Docket No. | | Brief Page No. |
|---|---|---|
| 101 | Consent Order Modifying Remaining Deadlines under Case Management Order | 7 |
| 103 | Response filed by Plaintiffs re Motion for Direction on Discovery Pertaining to Identifying Potential Members of the Putative Class of Active-Duty Customers | 34 |
| 110 | Reply by Defendants re Motion for Direction on Discovery Pertaining to Identifying Potential Members of the Putative Class of Active-Duty Customers | 34 |
| 122-3 | Department of Defense Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents (Aug. 9, 2006) – Exhibit 40 in Support of Plaintiffs' Motion for Class Certification | 12 |
| 127 | March 15, 2013 Status Report and Joint Motion for Stay | 33, 34 |
| 131 | May 24, 2013 Status Report and Joint Motion for Continuation of Stay | 35 |
| 166-1 | Declaration of Terry Fields | 2 |
| 169 | Deposition of Plaintiff Estevan Castillo | 29 n.5 |
| 170 | Deposition of Plaintiff Jason Cox | 29 n.5 |
| 171 | Deposition of Alesia Lewis-Vinson | 29 n.5 |
| 176 | Exhibit A (McGimsey's 9-11-2013 Supplemental Report) to Plaintiff's Reply in Support of Class Certification | 2 |
| 187 | Hearing Transcript on Motion for Class Certification under Rule 23(b)(2) | *passim* |

| 189-1 | Third Declaration of Terry Fields | 35 |
| 191 | Plaintiffs' Supplemental Brief in Support of Class Certification and Brief in Support of Motion for Leave to Amend Plaintiffs' Second Amended Complaint | 6, 18, 52-53 |
| 198-1 | Exhibit 1 to Defendants' Response in Opposition to Plaintiffs' Motion for Leave to Amend Complaint a Third Time | 7 |
| 204 | Order on Class Certification | *passim* |

Appellees' Brief contains the same fuzzy analysis of difficult issues that left the district court profoundly un-assisted when it came to conducting the required "rigorous analysis" of class-certification issues. Appellees' defense of the Order boils down to: rigorous analysis is in there somewhere, or maybe in the hearing transcript. The result is an invitation to affirm based on the vague sense that some class is certifiable. (R.191 at 5 ("utilizing some portion of Rule 23 is apt").) But reviewing courts do not presume satisfaction of Rule 23 requirements or accept implicit findings on key issues like commonality and predominance. *General Tel. Co. v. Falcon*, 102 S.Ct. 2364, 2372 (1982) ("actual, not presumed, conformance with Rule 23(a) [is] indispensable"). Contrary to Appellees' assertion (Brief 49), this Court has not endorsed *sub silencio* class-certification analysis. "[T]he 'rigorous analysis' required of a district court under Rule 23 does not allow [this Court] to be so generous or forgiving." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1269 (11th Cir. 2009).

Fostering a false impression of class-wide commonality, Plaintiffs dismiss the material differences between the various kinds of transactions at issue (pawns, pledges, title loans, and Texas credit services) as mere "names" under state law. (Brief 3, 5.) Asserting that all transactions are "substantively the same" without showing how that is true, Plaintiffs emphasize processing of transactions through a

computer. (Brief 3, 5.) Yet uniformity in back-office systems cannot make substantively different transactions the same. It cannot create a promise to pay when the customer's contract contains none or impose personal liability not established by the parties' agreement (and prohibited by state law). How computers process and track transactions is immaterial to whether the transaction involves credit regulated by the MLA. Commonality in material contract terms, not back-office processes, is essential to class certification.

The distinctions between pawn, pledge, loan, and Texas credit-services transactions reflect fundamentally different legal relationships. The differences go directly to applicability of the MLA. This chart summarizing the exemplar contracts (R.166-1) shows the state-by-state differences and the customer count in each state (R.176):

| State | Kind | Title, material terms, etc. | #Customers[1] |
|---|---|---|---|
| GA | Pawn | "Motor Vehicle Pawn Agreement and Disclosure/Receipt"; "pawn transaction" with title _sold_ subject to redemption; no promise to pay; no obligation to redeem; no personal liability | 568 |
| AL | Pawn | "Pawn Agreement and Disclosure/Receipt"; "pawn transaction" with title pledged subject to redemption; no promise to pay; no obligation to redeem; no personal liability | 129 |
| PR | Pawn | "Title Pledge Agreement and Disclosure/Receipt"; Pawnbroker; no promise to pay; no obligation to redeem no personal liability | 5 |
| MS | Pledge | "Title Pledge Agreement and Disclosure/Receipt"; refers to "loan" but no promise to pay; pledgor may "redeem" title but no obligation to; no personal liability; 85% of repo surplus returned | 14 |
| TN | Pledge | "Title Pledge Agreement and Disclosure/Receipt"; refers to "property pledged," "loan," but no promise to pay; pledgor may "redeem" title but no obligation to; no personal liability; repo surplus returned | 4 |
| AZ | Loan | "Secondary Motor Vehicle Finance Agreement and Security Agreement"; promise to pay; personal liability; attorney's fees for collection | 9 |
| DE | Loan | "Loan Agreement, Promissory Note and Security Agreement"; promise to pay; sole remedy is repo/sale; no personal liability for deficiency; repo surplus returned | 2 |

---

[1] Active-duty customers who did not sign a negative CBIS, together with 31 potential dependents whose files contain some indication of military-dependent status. The low numbers outside Alabama and Georgia result from Defendants' MLA compliance program.

| | | | |
|---|---|---|---|
| ID | Loan | "Loan Agreement, Promissory Note and Security Agreement"; promise to pay; personal liability; attorney's fees for collection if >$1,000; repo surplus returned | 0 |
| IL | Loan | "Title Secured Loan and Security Agreement"; promise to pay; personal liability; attorney's fees for collection; repo surplus returned | 8 |
| LA | Loan | "Disclosure Statement, Promissory Note and Security Agreement"; promise to pay; personal liability; acceleration upon default; debtor acknowledges debt and confesses judgment; attorney's fees for collection up to 25% of debt | 5 |
| MO | Loan | "Loan Agreement, Promissory Note and Security Agreement"; promise to pay; personal liability; charge for late payments; attorney's fees for collection | 8 |
| NV | Loan | "Loan Agreement, Promissory Note and Security Agreement"; promise to pay but sole remedy is repo/sale, except personal liability for fraud | 8 |
| NH | Loan | "Loan Agreement, Promissory Note and Security Agreement"; promise to pay; personal liability; attorney's fees for collection; repo surplus returned; | 0 |
| NM | Loan | "Loan Agreement, Promissory Note and Security Agreement"; promise to pay; personal liability; attorney's fees for collection; repo surplus returned | 5 |
| SD | Loan | "Loan Agreement, Promissory Note and Security Agreement"; promise to pay but sole remedy is repo/sale; no personal liability except in cases of fraud; repo surplus returned, less expenses | 1 |
| UT | Loan | "Loan Agreement, Promissory Note and Security Agreement"; promise to pay but sole remedy is repo/sale; no personal liability for deficiency; repo surplus returned | 5 |

| | | | |
|---|---|---|---|
| WI | Loan | "Loan Agreement, Promissory Note and Security Agreement"; promise to pay; no personal liability for deficiency unless fraud; repo surplus returned | 6 |
| TX | Credit Services | "Loan Agreement and Promissory Note" with third-party lender; CSO paid upon consummation; promise to pay lender; personal liability to lender; repo surplus returned | 99 |

As this chart reveals, some transactions involve debt, others do not, still others seem like hybrids, and Texas is uniquely situated. Plaintiffs cannot show, as a matter of fact or law, that the substantive differences are immaterial to class-certification or the merits.

## <u>ARGUMENT</u>

### I.    **Plaintiffs did not show good cause for their late strategic change from Rule 23(b)(2) to (b)(3).**

Diligence is the linchpin of Rule 16(b)(4)'s good-cause standard for modifying scheduling orders:

> This good cause standard precludes modification unless the schedule cannot be met despite the diligence of the parties seeking the extension.  If a party was not diligent, the inquiry should end.

*Sosa v. Airprint Systems, Inc.*, 133 F.3d 1417, 1418 (11th Cir. 1998) (internal quots. and cit. omitted).

Like the court below (Order 32-33), Plaintiffs ignore diligence, favoring a prejudice analysis.  (Brief 29-31.)  Because the "good cause" inquiry ends if a party cannot show diligence, prejudice is irrelevant to Rule 16's standard.  *Mason v. George*, 2014WL583004, *1 (M.D. Ga. 2014); *United States v. $33,330.00 in U.S. Currency,* 901 F.Supp.2d 1354, 1359 (N.D. Ga. 2012); *Girard v. Aztec RV Resort, Inc.*, 2011WL7962612, *3 (S.D. Fla. 2011); *Smith v. West Facilities Corp.*, 2006WL898134, *4 (S.D. Ala. 2006).  The district court applied, and Plaintiffs present, the wrong standard.

To be sure, Defendants suffered prejudice from Plaintiffs' late change to Rule 23(b)(3).  Defendants made innumerable strategic and tactical decisions based on Plaintiffs' pursuit of class certification under Rule 23(b)(2), not (b)(3).  When this was solely a (b)(2) case, for example, Defendants agreed to address

certification along with the merits at the end of discovery (R.198-1) and did not object to Plaintiffs' request for a ruling on summary-judgment motions at the same time as class certification. (Hr'g 32-33.) Those decisions were made precisely because Plaintiffs sought only a (b)(2) mandatory class with no opt-out rights. *See Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2558 (2011). With a (b)(3) class certified and summary judgment granted on the RICO claim, Defendants face one-way intervention, as class members opt-out to avoid being bound by the adverse ruling on RICO. *See American Pipe & Constr. Co. v. Utah*, 94 S.Ct. 756, 763-64 (1974).

Plaintiffs argue "there is not a scintilla of evidence...that [they]...have not been diligent in pursuing this case...." (Brief 27.) That, too, is beside the point. What matters is not general diligence "in pursuing this case" but lack of diligence in not seeking (b)(3) certification earlier. To show good cause, Plaintiffs had to prove the deadline for class-certification motions (R.101) could not be met despite their diligence. Yet Plaintiffs could have included (b)(3) as grounds for class certification in their original Complaint, the First and Second Amended Complaints, and their timely class-certification motion. The reason they didn't was not inability-despite-diligence, but pure strategy. They thought (b)(2) was "cleaner." (Hr'g 48.) Ill-advised strategic choices preclude finding diligence. *Sosa*, 133 F.3d at 1418.

Plaintiffs have not explained how efforts to identify potential classmembers (Brief 27) could have any bearing on Plaintiffs' decision to not seek (b)(3) certification within the deadline. Identifying classmembers is equally important under (b)(2) and (b)(3). The only thing that changed was Plaintiffs' realizing at the hearing that (b)(2) was in trouble. In allowing Plaintiffs to change strategies so late without having shown inability to meet the deadline despite diligence, the district court applied the wrong standard and abused its discretion.

**II.    No common claim exists, because the MLA does not contain an implied private right of action.**

Plaintiffs glide too freely between disparate concepts, lines of reasoning, and authorities.  Mentioning *Alexander v. Sandoval*, 121 S.Ct. 1511 (2001), only in passing, Plaintiffs principally rely on *TransAmerica Mortgage Advisors, Inc. v. Lewis*, 100 S.Ct. 242 (1979), but occasionally argue that the pre-amendment MLA has an <u>express</u> private right of action somewhere.  Fidelity to current law requires applying the test of *Sandoval* and *Love v. Delta Air Lines, Inc.*, 310 F.3d 1347 (11th Cir. 2002), before considering whether *TransAmerica* has any vitality.

According to Plaintiffs, the "district court…correctly determined that the MLA of 2007 contain an implied private right of action…to recover consequential and punitive damages."  (Brief 19.)  Wrong.  The court referred to "damages" and unjust enrichment (Order 10-12) but did not hold "consequential and punitive damages" recoverable.  Plaintiffs stretch the court's holding because the cause of action they assert is punitive, not restitutionary.  (Hr'g 26-28.)  And in reaching for consequential and punitive damages, Plaintiffs <u>defy</u> *TransAmerica*, 100 S.Ct. at 249, which held that declaring contracts void implied a *limited* private right of action for rescission and restitution, not for damages of any kind.

*A. The MLA contains no express private right of action.*

Though the district court was not convinced, Plaintiffs revert to arguing for an express private right of action.  (Brief 32-35.)  It is unclear whether Plaintiffs

9

contend the savings clause, 10 U.S.C. §987(f)(2), itself creates an express private right of action or merely recognizes creation elsewhere. Plaintiffs never explain where, exactly, their express private right may be found other than, perhaps, in the word "void." Yet that word is not infused with rights- and remedy-creating intent.

The savings clause does not itself create private rights or remedies, nor does it "evidence any intent to create a private cause of action." *In re Mexico City Aircrash*, 708 F.2d 400, 407 (9th Cir. 1983). The savings clause first refers non-specifically to "rights and remedies provided under this section," then saves from preemption rights and remedies conferred by *other* law. Contrary to Plaintiffs' argument (Brief 35), that mere reference does not evidence positive intent to create a private cause of action. The MLA's savings clause points elsewhere for creation of rights and remedies. It cannot carry the day, for an express or implied private right.[2]

---

[2] Plaintiffs' reliance on the unpublished Magistrate's opinion in *Linscott v. Vector Aerospace*, 2006WL240529, *7 (D. Or. 2006), is misplaced. That court ignored *Sandoval* and managed to reverse *Sandoval*'s presumption that no private right of action exists unless Congress intended to create one.

**B. The court erred in finding an implied private right of action.**

1.   The MLA fails the *Sandoval/Love* test.

a.  The text contains no rights- or remedy-creating language.

Like the district court, Plaintiffs fail to apply the first part of the *Sandoval/Love* test.  Plaintiffs cannot deny that the MLA's text focuses on the actor subjected to criminal sanction and the conduct proscribed, without conferring a private right or remedy.  The only remedy created is the public one.  Plaintiffs' reliance on provisions declaring contracts void and making arbitration clauses unenforceable by creditors is misplaced.  Neither provision *creates* rights.  Both *extinguish* rights.  Plaintiffs offer no riposte.  The assertion that "Congress clearly contemplated that a person could claim relief under the penalties and remedies section" (Brief 37) fails to recognize that declaring contracts void and arbitration clauses unenforceable by creditors differs markedly from conferring private rights and remedies, especially Plaintiffs' claim for punitive damages.

b.  The MLA has a strong public enforcement mechanism.

The district court imposed a heightened requirement of an "administrative enforcement mechanism." (Order 11.)  Plaintiffs raise the bar higher still, arguing lack of enforcement authority in the CFPB and federal banking agencies "strongly indicate that no administrative agency had enforcement authority under the original version" of the MLA.  (Brief 37 (citing 72 Fed.Reg. 50,590).)  The very authority

Plaintiffs cite undermines their argument, confirming DoD's "understand[ing]" that the MLA had layers of enforcement. Federal banking regulators. State agencies supervising non-bank lenders. DoD assistance to states. Plus, of course, criminal prosecution. That multi-layer administrative enforcement mechanism does not by any stretch imply creation of a private right of action.

### c. Statutory context points away from implied rights of action.

Plaintiffs rely on the 2006 DoD Report and DoD comments in rule-making history. (Brief 37-39.) The Report mentions private rights of action only once, criticizing a bill for lacking one. (R.122-3 at 53-54.) The rule-making comments wonder aloud whether private enforcement will suffice but do not address whether a private right of action exists. 72 Fed.Reg. 50,590. Neither remark clarifies the statutory text sufficiently to conclude that *Congress* intended to create a private right and remedy. *Love*, 310 F.3d at 1352-53.

To downplay the 2013 MLA amendment, Plaintiffs cite *U.S. v. Jordan*, 915 F.2d 622, 627 (11th Cir. 1990), which held that Congressional adoption of new statute A and amendment of rule B did not implicitly circumscribe relief under unmodified statute C. (Brief 38-39.) Here, Congress amended the MLA to create an express private right of action. The question is whether the same statute previously contained an implied private right of action created by Congress *sub*

*silencio*.  The purely prospective amendment reflects Congressional understanding that no private right existed and weighs heavily against inferring one.

> **2.**   **If *TransAmerica* remains good law after *Sandoval*, the implied private right is a limited one for rescission and restitution.**

Defendants are not trying to "erase binding Supreme Court precedent" (Brief 33) in *TransAmerica.*   The Supreme Court refocused implied-private-right-of-action jurisprudence with *Sandoval*'s singular focus on Congressional intent and the primacy of statutory text and structure to the search for intent.   Defendants drew attention to *TransAmerica* because, if it remains good law after *Sandoval*, it precludes finding an implied right of action for the "punitive" remedy Plaintiffs seek.   *TransAmerica* permits at most a limited right to sue for rescission and restitution, not for damages.   *TransAmerica*, 100 S.Ct. at 246, 250.

### C. The court's private-right-of-action ruling stopped short of deciding what, if any, common remedy is available?

Plaintiffs eschew the *Sandoval*/*Love* requirement of textual support for a private remedy and defy *TransAmerica*'s limitation to rescission and restitution. While the district court referred to both damages and "an unjust enrichment remedy" without deciding whether class-wide litigation will determine rights under the MLA or remedies too (Order 11, 12 n.4), Plaintiffs reach for latitude allowing the court to fashion "meaningful class-wide relief."   (Brief 34 n.13 (citing *Gebser*

*v. Lago Vista Indep. Sch. Dist.*, 118 S.Ct. 1989 (1998), *Liese v. Indian River Cnty Hosp. Dist.*, 701 F.3d 334 (11th Cir. 2012).)

*Gebser* and *Liese* both involved setting the standard for liability on a previously-recognized implied private right of action. *Gebser*, 118 S.Ct. at 1997; *Liese*, 701 F.3d at 347-48. Neither decided the extent of damages available, much less held that courts have discretion to fashion whatever remedy they like. The *TransAmerica* dissent argued that very proposition unsuccessfully. *TransAmerica*, 100 S.Ct. at 252-53 (White, J., dissenting). Rejecting that, the *TransAmerica* Court held that the private right of action was limited to rescission and restitution net of benefits received, "not for any other compensation or damages." *Id.* at 249 & n.14.

The district court's error in failing to find a remedy created by Congress and decide what that remedy is, has left Plaintiffs open to argue—even after class certification—for judicial discretion to fashion something suitable to class-wide adjudication. *Sandoval* and *Love* authorize no such free-for-all. *TransAmerica* specifically forbids it. Congress, not the courts, must fashion the remedy, for federal tribunals are not common-law courts. *Sandoval*, 121 S.Ct. at 287. Plaintiffs' argument for judicial discretion proves that Congress did not create a private remedy in the MLA.

Under the *Sandoval*/*Love* test, the MLA implies no private right of action. If *TransAmerica* remains good law, the MLA implies only a limited right to

restitution.  Yet Plaintiffs have not sued for restitution.  They claim a punitive remedy.  Since the MLA does not create a private right of action for the punitive remedy Plaintiffs seek, no common claim exists and no class should have been certified.  *Cf. Christ v. Beneficial Corp.*, 547 F.3d 1291, 1298 (11th Cir. 2008) (certification vacated because no private right of action existed for remedy sought).

**III.    The district court failed to identify common claims, issues, and defenses.**

Assuring the Court that the district court did "define the class and the class claims, issues, or defenses," Plaintiffs point in vain to the Order and the hearing transcript, generally.    The Order's first twenty-eight pages address common defenses, Plaintiffs contend, while the transcript shows "Judge Land was certainly not a passive jurist."    (Brief 40, 42.)    As authority for such a nebulous review, Plaintiffs cite *Shahriar v. Smith & Wollensky Rest. Group, Inc.*, 659 F.3d 234, 252 (2d Cir. 2011).    That case did not even address the Rule 23(c)(1)(B) requirement that the <u>Order</u> "define" the class claims, issues, or defenses.

Defendants acknowledge that Judge Land was thoroughly prepared for the hearing and engaged counsel with thoughtful questions about the private-right-of-action and (b)(2) certification issues.    But that does not excuse the failure to comply with Rule 23(c)(1)(B).    Anyway, nothing said at the hearing defined the class claims, issues, or defenses.

As for the Order, the first twenty-eight pages address Defendants' motions for summary judgment.    The court granted summary judgment on RICO but denied it on the private-right-of-action and applicability-of-the-MLA issues.    Nowhere in those pages does the court identify class claims, issues, or defenses.

Plaintiffs suggest two: (1) whether the MLA confers a private right of action, and (2) whether "defenses based on conflicting state law were preempted and [] the

transactions sued upon were 'consumer credit'" within the meaning of the MLA. (Brief 41.)  The first does qualify as a common claim, issue, or defense—the only one common across the class.  The second conflates a number of different issues (construction of contracts, interpretation of state law, application of the MLA, preemption) arguably qualifying as common within each state or groups of states, though not nationwide.  Even in Plaintiffs' formulation, all other (unspecified) issues in this case remain for individualized resolution.

The Order, hearing transcript, and Plaintiffs' Brief all fail to answer the most basic question in any class action: what will be adjudicated on a class-wide basis. While such fuzzy reasoning alone warrants reversal, applying the required rigorous analysis demonstrates that no class is certifiable in this case.

**IV. The district court's analysis of commonality and typicality was flawed.**

    *A.    The district court's different rulings on applicability of the MLA show the lack of commonality and typicality.*

Plaintiffs' Brief never cites *Wal-Mart Stores v. Dukes*, the case that "changed the landscape" of commonality analysis by requiring not just common questions but capacity to generate common answers.

For nationwide commonality, Plaintiffs propose two questions : (1) Does the pre-2013 MLA authorize a private right of action?; (2) Are Plaintiffs' transactions covered by the MLA?  (Brief 43-44.)  The first is a common question with a common answer, as shown in Part II *supra*.  The second, however, poses exactly the kind of question forbidden by *Dukes*.  Just as a law "can be violated in many different ways," *Dukes*, 131 S.Ct. at 2551, different kinds of transactions may or may not be covered by the MLA for different reasons.  Commonality exists only when class claims

> depend on a common contention…of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.  …  Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

*Id.* (internal quotation omitted).

According to Plaintiffs, the "trial court's analysis [of the second question] shows why this is a common issue subject to common resolution."  (Brief 44.)  Yet Plaintiffs' review of the MLA-applicability analysis (Brief 47-48) shows the

different facts considered and reasoning applied to pawns, pledges, and Texas credit services. (Order 39-45.) While Plaintiffs paint all transactions with a broad brush the district court analyzed them separately within groupings by kind, considering materially different contract terms and regulatory regimes in evaluating whether class-members' transactions are "consumer credit" covered by the MLA. That the district court ultimately "rejected" the no-credit defense for all kinds of transactions matters not, except insofar as it shows that reaching the answer required delving deep into the merits. The commonality analysis was complete, and the district court should not have gone any further, once it became apparent that different contract terms and legal relationships required different analyses to answer the deceptively simple question Plaintiffs posed. *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S.Ct. 1184, 1194 (2013).

The decision on applicability of the MLA to Texas transactions highlights the commonality and typicality problem. (Order 43-45 ("A reasonable factfinder could conclude that Texas Car Title" is a creditor for purposes of the MLA.).) Even though "Plaintiffs acknowledge that Texas Car Title is not the 'lender' in the transactions," they will have to prove at trial that Texas Car Title is a "creditor." That proof will have no bearing on potential recovery by the Named Plaintiffs or classmembers in other states. The Texas issues are unique, not common to all

classmembers. And the Named Plaintiffs' claims—that pawns are covered—are not typical of Texas classmembers' claims.

To generate nationwide commonality, Plaintiffs invoke preemption to erase the dissimilarities between various kinds of transactions, but make no effort to explain why preemption makes the differences under state law "ineffectual." (Brief 45-46.) The MLA preempts state and federal law "to the extent that such law, rule, or regulation is inconsistent with" the MLA. 10 U.S.C. §987(d). Statutes providing for preemption of "inconsistent" laws are "narrow," such that "state law must actually interfere with the operation of federal law for it to become preempted…." *Briggs v. Countrywide Funding Corp.*, 949 F.Supp. 812, 814 (M.D. Ala. 1996). By necessity, courts consider state law to ascertain what it provides in order to determine whether an inconsistency exists for preemption. *Altria Group, Inc. v. Good*, 129 S.Ct. 539, 543 (2008). State law authorizing an APR greater than 36% in loans to covered borrowers would be inconsistent with the MLA and thus preempted. But contract terms and substantive state law making the various kinds of transactions different—some involve promises to pay and personal liability, others do not, Texas involves a third-party lender—embody no inconsistency with the MLA. Alas, this is not really a preemption issue at all. One must look at the contract and regulatory scheme to ascertain *what legal relationship the transaction creates*, then analyze whether that transaction involves

credit or debt, in order to determine whether the MLA regulates it. Recognizing the legal relationship under state law has consequences under the MLA, but that is not a conflict between state and federal law. Preemption does not make applicability of the MLA a common issue nationwide.

Plaintiffs apparently concede that the Named Plaintiffs' claims are typical of class members only in Pawn Jurisdictions. Without class representatives anywhere else, the class cannot go beyond Alabama, Georgia, and Puerto Rico.

### B.     The MLA does not apply to pawns, pledges, or Texas services.

After framing the first issue on appeal as whether the MLA applies to the transactions at issue (Brief 1), Plaintiffs' Brief never mentions the regulations' definition of credit. 32 C.F.R. §232.3(d). Plaintiffs offer bare conclusions without construing the MLA's definitions and applying them to pawns, pledges, or Texas credit-services transactions. For Plaintiffs cannot cure three major flaws in the district court's reasoning that erroneously convert pawns and pledges into "closed-end credit," thence into "consumer credit" governed by the MLA.

The regulations cover "vehicle title loans" by name but omit any reference to pawns, pledges, or credit services. 32 C.F.R. §232.3(b)(1). The regulations do not adopt or copy the definition of "closed-end credit" from Regulation Z. (Order 15, 18 n.6.) The regulations adopt Regulation Z's definition of "open-end credit" but not its definition of "closed-end credit." 32 C.F.R. §232.3(a). The distinction

is important because Regulation Z covers a laundry list of transactions deemed closed-end credit for which TILA disclosures are required, whereas the MLA regulations contain a very short list and specific definition of closed-end consumer-credit transactions governed by the MLA.[3]  In promulgating the regulations, DoD could have adopted the Regulation Z definition of closed-end credit or defined "consumer credit" as including pawns.  But it did not.  DoD created its own definition of "consumer credit," identifying three kinds of transactions that qualify—without mentioning pawns.  The district court's reasoning that DoD achieved that result by adopting the Staff Interpretation stumbles over the realization that the MLA regulation does not adopt the Regulation Z definition of "closed-end credit."

While the MLA regulation's definition of "Regulation Z" includes official staff interpretations, 32 C.F.R. §232.3(i), the Official Staff Interpretation relied upon by the district court *does not* actually deem pawns closed-end credit for purposes of TILA.  12 C.F.R. Pt. 226, Supp. I, Subpt. C, ¶17(c)(1)(18).  The Fed Staff evidently considered pawns similar enough to close-end credit transactions to warrant requiring pawnbrokers to make TILA disclosures.  But the Staff Interpretation states simply that disclosures are required for pawns.  The district

---

[3] Adopting the TILA definition of open-end credit but not closed-end credit made sense, since the MLA does not regulate any open-end credit and applies to a small subset of closed-end credit.

court erred in holding that the Staff Interpretation "included 'pawn transactions' as a type of closed-end credit." (Order 16, 18 n.6.)

DoD is considering amending the regulations to reach products not presently covered. "The Department proposes to revise the scope of the definition of 'consumer credit' to cover a boarder range of closed-end and open-end credit products, to be generally consistent with the credit products that for decades have been subject to the requirements of…Regulation Z." 79 Fed.Reg. 58,601 Part III(A). This recent development confirms the district court's error.

The district court held that, though state law may not consider pawns and pledges credit transactions, they nevertheless qualify as "consumer credit." (Order 20, 42.) Adding the word "consumer" does not expand the meaning of "credit." The regulations' definition of "consumer credit" is designedly narrow, encompassing only three listed kinds of closed-end credit, which must involve "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 32 C.F.R. §232.3(d). So, by the plain meaning of the regulations, to qualify as "consumer credit" governed by the MLA, a transaction must involve *debt*. As neither the MLA nor Regulation Z defines *debt*, the MLA affords that term the meaning given to it by state or federal law or contract. 32 C.F.R. §232.3(i). Construing the contracts at issue and considering applicable state laws leads to the conclusion that no debt exists, so pawns and pledges do not

qualify as "consumer credit" covered by the MLA. The district court erred in holding the contrary. And since Plaintiffs concede Texas Car Title is not the lender in Texas credit-services transactions, it could not have violated the MLA.

**V. The district court failed to conduct a rigorous analysis of predominance.**

The district court's predominance analysis, Plaintiffs argue, was "*sub silencio*," "implicit," and "*ipso facto*." (Brief 49-51.) Not surprising, since predominance analysis appears nowhere in the Order, other than for customers ruled out of the class.

Plaintiffs invoke *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256 (11th Cir. 2009), as "stating that a district court may 'engage in a predominance assessment *sub silencio* in other parts of its order.'" (Brief 49.) Plaintiffs misread *Vega* badly. In *Vega*, this Court first held:

> [W]hile the court arguably made an effective predominance determination, it managed to do so—as if by accident—without a single reference to Rule 23(b)(3) and with an all-to-cursory discussion of the relevant facts. Rule 23 demands significantly greater analytical rigor and precision; backing into the requisite findings and relying on a reviewing court to connect the dots, is not enough. We therefore find that the district court abused its discretion by following improper procedures in making its determinations, to the extent that it made them at all, with respect to commonality and predominance.

*Id.* at 1269-70. The Court later commented:

> To the extent that the district court may have attempted to engage in a predominance assessment *sub silencio* in other portions of its order, we have already addressed why its efforts were insufficient....

*Id.* at 1278.

Plaintiffs resort to *Shahriar* for the proposition that district courts in the Second Circuit need not "'utilize any particular verbal formula [or] make express

findings on each [Rule 23(b)(3)] requirement.'" (Brief 49.)   Still, the Second

Circuit requires the basis of the ruling to be "obvious in context."  *Shahriar*, 659

F.3d at 252.  The basis for the district court's predominance conclusion here is far

from obvious.  Unlike in *Shahriar*, the district court made no (b)(3) findings at the

hearing, which concerned only certification under (b)(2).   Save for the one-

sentence conclusion in the "Summary" (Order 45), the Order mentions

predominance only for customers ruled out of the class by a negative CBIS.

However forgiving the Second Circuit may be for obvious-in-context findings, this

Court has not endorsed "*sub silencio*" analysis of class-certification requirements.

Plaintiffs argue that predominance analysis lies (*sub silencio*, apparently) in

the section of the Order wherein the district court "rejected" various defenses to

applicability of the MLA.   (Order 39-45.)   In that section, Plaintiffs argue, the

district court "held that...the common questions of law and fact predominate over

any state differences regarding the name of the financial product." (Brief 51.)  The

district court made no such holding.  The court did rule that customers in those

states "should not be excluded from the class" (Order 40, 42, & 45), but the court's

analysis of whether the MLA applies to pawns, pledges, and Texas credit-services

transactions (a commonality issue) contained no predominance analysis.  Even if

the predominance analysis lurks silently in that section, Plaintiffs cannot rely on

this Court to connect the dots.  A similarly imprecise (or worse) class-certification order caused "great concern" and necessitated reversal in *Vega*.

Defendants appreciate that the district court conducted a rigorous analysis of whether including in the class customers who signed a negative CBIS would introduce too many individualized issues for predominance.  (Order 38-39.)  The predominance analysis for customers ruled out of the class does not, as Plaintiffs argue, "*ipso facto*" establish that the court conducted a rigorous predominance analysis for customers ruled in.  (Brief 50.)  If the court conducted a predominance analysis for the certified class, it must have been "*sub silencio.*"

As Plaintiffs concede, the "MLA only penalizes creditors who knowingly violated the Act."  (Brief 39.)  Recognizing that the knowledge element "must be resolved on a person-by-person basis," the district court excluded from the class customers who signed negative CBIS's.  (Order 38.)  But the court ignored the knowledge element for the class actually certified.  To establish an MLA violation, knowledge of covered-borrower status must be proven for each classmember.  Trying the knowledge element on a "person-by-person basis" means any common cannot predominate over that highly individualized issue.

Defendants do not contend that calculating the individualized damages Plaintiffs claim under their "punitive" private right of action, or the restitution amount in *TransAmerica*, standing alone, cause this case to fail the predominance

test. But defenses to restitution such as *in pari delicto*, unclean hands, and voluntary payment, all of which turn on facts unique to each class member, will cause any common questions to be "submerged by individual ones." *Sacred Heart Health Sys. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1170 (11th Cir. 2010). Plaintiffs do not and cannot point to any predominance analysis with respect to those individualized defenses or the knowledge element of the MLA. Under the required rigorous analysis, predominance is lacking.

Plaintiffs argue that the district court "implicitly (and necessarily)" rejected the voluntary-payment-doctrine defense. (Brief 51.) Yet the district court didn't even allude to that defense, or any of the other individualized defenses raised. The court certainly did not conclude, nor could it conclude, that preemption extinguishes the defense in various states, thus preserving predominance. The doctrine affects the balance of equities and may weigh against restitution, but it does not conflict with the MLA, so preemption is not implicated. Anyway, federal law recognizes the doctrine too. *Air España v. Brien*, 165 F.3d 148, 153 (2d Cir. 1999).

Finally, the district court suggested that unjust enrichment might supply an appropriate remedy.[4] As the district court did not conduct a predominance analysis for unjust-enrichment claims, Plaintiffs offer their own, assuring the Court that

---

[4] Plaintiffs asserted an unjust-enrichment claim only for themselves, not the class.

unjust-enrichment claims are amenable to class treatment because Defendants' business operations "are the same as to all members of the putative class." (Brief 52-53.) In *Vega*, this court held that the necessary inquiry into individual equities attending each class member makes an "unjust-enrichment claim inappropriate for class-action treatment." *Vega*, 564 F.3d at 1274-75. The exceptions Plaintiffs cite involved no possibility of individualized proof affecting the balance of the equities. Plaintiffs have not proven that true here, as the circumstances of individual classmembers may well weigh against finding any enrichment "unjust."[5] Any number of other personalized facts may affect the balance of equities. Uniform business practices unrelated to the elements of the unjust-enrichment claim have no bearing on predominance, *EQT Prod. Co. v. Adair*, 2014WL4070457, *17-18 (4th Cir. 2014), and do not render irrelevant classmembers' personal circumstances.[6]

---

[5] Defendants submit that the individual circumstances and personalized facts of the Named Plaintiffs demonstrate that unjust enrichment cannot be tried class-wide. (R.169 at 86, 96; R.170 at 39-40; R.171 at 55-58, 136-37.)

[6] Plaintiffs assert that unjust-enrichment laws do not vary among states (Brief 52-53), but have not met their burden of demonstrating homogeneity of state law on unjust enrichment. *Sacred Heart*, 601 F.3d at 1180; *In re ConAgra Peanut Butter Litig.*, 251 F.R.D. 689, 697-98 (N.D. Ga. 2008) (variations in state unjust-enrichment law "prevent the Court from finding that common issues of law predominate").

The district court did not analyze predominance for the class actually certified. Plaintiffs have not established that common issues predominate over individual ones.

## VI. The district court failed to conduct a rigorous analysis of superiority and manageability.

A trial plan was not required, Plaintiffs argue. Fair enough. But Plaintiffs still had to prove superiority and manageability somehow. Preferring the "figure-it-out-as-we-go-alone" approach, *Robinson v. Texas Auto Dealers Ass'n*, 387 F.3d 416, 426 (5th Cir. 2004), Plaintiffs have not suggested how this case, with its myriad individualized issues, can be tried manageably in a fashion superior to individual actions.

Plaintiffs have not addressed the thousands of mini-trials necessary to prove Defendants' knowledge of each classmember's covered-borrower status, allow a balancing of personalized equities, try other individualized defenses, and determine class membership. Resolving those issues necessarily involves "presentation of a substantial amount of evidence specific to each of an unknown number of class members. This reality poses serious challenges to the efficiency and manageability of the class action proceeding." *Vega*, 564 F.3d at 1278. Plaintiffs' failure to meet their burden is reflected in the district court's bare conclusion on superiority and manageability, "which cannot truly be called analysis, is grossly insufficient, and easily rises to the level of abuse of discretion." *Vega*, 564 F.3d at 1278.

Plaintiffs acknowledge that a complete failure to address the factors in Rule 23(b)(3)(A)-(D) is an abuse of discretion. (Brief 54-55 (quoting *Vega*).) So Plaintiffs seemingly argue, again, that the district court analyzed those issues *sub*

*silencio* in two other parts of the Order.  (Brief 55-56.)

First, the analysis of good cause for the late switch to Rule 23(b)(3) noted there was no need to extend discovery since Defendants have been aware of what Plaintiffs want to recover.  (Brief 55.)  Even if true, that has no bearing on manageability or the other (b)(3)(A)-(D) factors.

Second, the court's MLA-applicability analysis, Plaintiffs argue, is "a clear example of the court engaging in an analysis of how it would handle a class action involving one federal statute that implicated numerous state laws."  (Brief 55-56.)  The court dealt with different state laws but made no comment on manageability.  The court simply held that the MLA applies to transactions in the pawn and pledge states and that "a reasonable fact finder could conclude" it also applies to Texas transactions.  (Order 44-45.)  Nowhere in that analysis—which really goes to commonality—did the district court address predominance, superiority, or any of the four (b)(3)(A)-(D) factors.

Small claim amounts make class treatment superior, Plaintiffs contend.  (Brief 54.)  Yet their plan involves classmembers filing subsequent individual actions to recover the damages Plaintiffs jettisoned in an effort to achieve certification under Rule 23(b)(2).  Certifying this case will not eliminate the need for the separate, individual lawsuits Plaintiffs acknowledge can be pursued economically.  Therefore, superiority cannot be established.

**VII. The district court committed clear error in finding a class including military dependents ascertainable.**

Plaintiffs contend dependents are ascertainable because "extensive progress was made towards collaboratively developing a reasonable and reliable way to identifying [*sic*] class members, including dependents," and the "class of dependents…for the most part has already been ascertained." (Brief 56, 59.) Nonsense. The parties came up with search methods to identify *potential* dependents, but cannot identify the universe of *actual* dependents. While there may be "little mystery about who Plaintiffs seek to include in the proposed class" (a comment about class definition, not ascertainability), much mystery remains about who would be in a dependents class—*which people*.

Plaintiffs' attempt to answer that question depends on a false premise: "there were *two* electronic DoD databases…*that can be and were used* to identify potential class members." (Brief 56-57 (emphasis added).) Among the "SCRA" and "MLA" databases, only the SCRA could be and was used, and it identified only active-duty customers. Neither database can be used to identify customers who were dependents at the time of their transactions.

The SCRA database tracks active-duty status of servicemembers but not dependents. (R.127 ¶5.) The MLA database tracks dependents but has important "limitations" (*id.*) highlighted in the very letter Plaintiffs cite. (Brief 57.) First, the MLA database does not provide "*past information* on either members or their

qualifying family members under 32 CFR Part 232." (R.103 at 12 (emphasis added).) Second, the MLA database does not contain all dependents, "particularly those whose status as a qualifying family member is based upon having the servicemember provide more than one-half of the individual's support...." (*Id.*) So the MLA database cannot be used for the necessary historical status as of the transactions dates, and even results for current status do not capture all dependents. When it came to identifying potential classmembers over a five-year period, the MLA database's lack of historical status information and inherent incompleteness made it useless. (R.110 at 6-7.)

Because of these limitations, the parties agreed the MLA database would not be used, *and it was not used*. While agreeing to use the SCRA database to identify active-duty servicemembers (R.127), the parties stipulated that, "[b]ecause the SCRA database does not contain information pertaining to servicemembers' dependents, the parties [would] work together in good faith to devise search criteria available within Defendants' customer database to identify potential dependents...." (R.127 ¶5.) The parties later agreed on a two-step "means of identifying those borrowers potentially covered by the MLA," emphasis on *potential*. The ascertainability problem lies in what resulted from the agreed method of searching for *potential* dependents.

The first step yielded 2,597 transactions with *potential* dependents.  (R.131 ¶2(b).)  The second step—a manual review of 2,597 files for evidence of dependent status—found just 31 customers with 105 transaction files containing some evidence of dependent status and no negative CBIS.  (*Id*; R.189-1 ¶6.) Disappointed, Plaintiffs maintain—without introducing any evidence of dependent status—that all 2,597 "hits" from the imperfect searches should count.  (R.189-1 ¶7.)  As a result, thousands of transactions fall into a "disputed" netherworld of *potential* class membership.

The only way to go from *potential* to actual classmembers would be thousands of mini-trials on the threshold individualized issue of class membership. *Marcus v. BMW of N. Am.*, 687 F.3d 583, 593 (3rd Cir. 2012) ("[I]f class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials' then a class action is inappropriate.").  Even then, the parties and the court have no way of knowing how many actual dependents were not captured by the imperfect computer searches.[7]  Thus, a class including dependents is not "clearly ascertainable."  *Little v. T-Mobile USA, Inc.*, 961 F.3d 1302, 1304 (11th

---

[7] Plaintiffs argue—for the first time on appeal—that direct-mail notice "sent to the addresses of the 2,597 potential dependents that have already been potentially identified [] will provide a means of confirming and verifying (through the electronic military databases) whether such dependents are 'covered borrowers' under the terms of the MLA."  (Brief 59.)  Again, neither military database can identify dependents: the SCRA does not track dependents and the MLA does not have historical information.

Cir. 2012). Finding the class "ascertainable because the parties have determined a way to identify covered borrowers who entered a vehicle title loan transaction during the relevant timeframe" (Order 45) was clear error as to dependents. False notions regarding the efficacy and use of the MLA database cannot alter that inescapable conclusion.

## RELIEF REQUESTED

Defendants/Appellants request that this Court vacate the Order and remand with instructions that no class be certified in this case.


This 3rd day of October, 2014.

Respectfully submitted,

SMITH, GAMBRELL & RUSSELL, LLP


/s/ *David C. Newman*
Stephen M. Forte
Georgia Bar No. 270035
Edward H. Wasmuth, Jr.
Georgia Bar No. 739636
David C. Newman
Georgia Bar No. 541148
Colin R.P. Delaney
Georgia Bar No. 216858

1230 Peachtree Street, N.E.
Promenade, Suite 3100
Atlanta, Georgia  30309-3592
Telephone: 404-815-3500
Facsimile:  404-815-3509

sforte@sgrlaw.com
ewasmuth@sgrlaw.com
dnewman@sgrlaw.com
cdelaney@sgrlaw.com

*Attorneys for Defendants/Appellants*

## CERTIFICATE OF COMPLIANCE WITH LENGTH LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.     This Brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because this Brief contains 6,990 words, excluding the parts of the Brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

2.     This Brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this Brief has been prepared in a proportionally spaced typeface using Microsoft Word/Microsoft Office Professional 2010 in 14-point Times New Roman.

This 3rd day of October, 2014.

/s/ *David C. Newman*
David C. Newman
Georgia Bar No. 541148

*Attorney for Defendants/Appellants*

## CERTIFICATE OF SERVICE

THE UNDERSIGNED counsel for Defendants/Appellants hereby certifies that this day he caused the foregoing **REPLY BRIEF OF APPELLANTS COMMUNITY LOANS OF AMERICA, *et al.*** to be served on all parties by means of the Court's ECF system on all registered participants and by depositing a service copy of same in the United States Mail with sufficient postage paid to ensure First Class delivery to the following counsel of record:

| | |
|---|---|
| Roy E. Barnes, Esq. | Kyle S. Fischer, Esq. |
| John R. Bevis, Esq. | Fischer \| Scott, LLC |
| J. Cameron Tribble, Esq. | 233 12th Street, Suite 200 |
| Barnes Law Group, LLC | Columbus, Georgia 31901 |
| 31 Atlanta Street | kyle.fischer@fischerscott.com |
| Marietta, Georgia 30060 | |
| roy@barneslawgroup.com | |
| bevis@barneslawgroup.com | |
| ctribble@barneslawgroup.com | |

The undersigned counsel further certifies that this day he caused the foregoing **BRIEF OF APPELLANTS COMMUNITY LOANS OF AMERICA, *et al.*** to filed with the Clerk of Court using the ECF system, with seven paper copies contemporaneously dispatched via FedEx for next-day delivery and filing with the Clerk at the below address:

John Ley, Clerk of Court
U.S. Court of Appeals for the Eleventh Circuit
56 Forsyth St., N.W.
Atlanta, Georgia  30303

This 3rd day of October, 2014.

/s/ *David C. Newman*

David C. Newman
Georgia Bar No. 541148

Smith, Gambrell & Russell, LLP
Promenade, Suite 3100
1230 Peachtree Street, NE
Atlanta, Georgia 30309-3592
Telephone:  404-815-3500
Facsimile:  404-815-3509
Email: dnewman@sgrlaw.com